UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

APRIL MALICK and ROB MALICK,
Individually and as Next Friend for
C.M., a minor child,

                    Plaintiffs,                               Hon. David M. Lawson
                                                     Mag. Judge Curtis Ivy, Jr

v                                                        No.  22-11126

CROSWELL-LEXINGTON COMMUNITY
SCHOOLS, CROSWELL-LEXINGTON
BOARD OF EDUCATION, DAN GILBERTSON,
and KYLE WOOD,

                    Defendants.

---

| | |
|---|---|
| Deborah L. Gordon (P27058) | Timothy J. Mullins (P28021) |
| Elizabeth Marzotto Taylor (P82061) | Kenneth B. Chapie (P66148) |
| Sarah Gordon Thomas (P83935) | Travis Comstock (P72025) |
| Molly Savage (P84472) | *Attorneys for Defendants* |
| Deborah Gordon Law | 101 W. Big Beaver Rd., Tenth Floor |
| *Attorneys for Plaintiffs* | Troy, MI 48084-5280 |
| 33 Bloomfield Hills Parkway, Suite 220 | (248) 457-7036 |
| Bloomfield Hills, Michigan 48304 | tmullins@gmhlaw.com |
| (248) 258-2500 | kchapie@gmhlaw.com |
| dgordon@deborahgordonlaw.com | tcomstock@gmhlaw.com |
| emarzottotaylor@deborahgordonlaw.com | |
| sthomas@deborahgordonlaw.com | |
| msavage@deborahgordonlaw.com | |

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56 AND BRIEF IN SUPPORT

Defendants move this Court for summary judgment pursuant to Fed. R. Civ. P.

56 for the reasons stated in the attached brief and Exhibits. Defendants have sought

concurrence from Plaintiff regarding their Motion for Summary Judgment.

Concurrence was denied.

/s/KENNETH B. CHAPIE
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendants

DATED:  April 18, 2023

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

APRIL MALICK and ROB MALICK,
Individually and as Next Friend for
C.M., a minor child,

          Plaintiffs,                     Hon. David M. Lawson
                                               Mag. Judge Curtis Ivy, Jr
v                                          No.  22-11126

CROSWELL-LEXINGTON COMMUNITY
SCHOOLS, CROSWELL-LEXINGTON
BOARD OF EDUCATION, DAN GILBERTSON,
and KYLE WOOD,

          Defendants.

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Rob and April Malick, who are white, have filed suit on behalf of their adoptive daughter, Plaintiff CM, who is African American. Plaintiffs claim she was racially harassed by students at Croswell-Lexington Community Schools (the District). Plaintiffs have filed suit against the District, its Board of Education, former Superintendent Daniel Gilbertson, and former High School Principal Kyle Wood. Plaintiffs have alleged violations of Title VI, the Equal Protection Clause and substantive due process under § 1983, and Michigan's Elliot-Larsen Civil Rights Act. Plaintiffs have **not** sued any of the students who allegedly harassed her. Therefore, this

1

case is not about whether Plaintiff was harassed. This case is about whether Defendants *responded* to the known complaints of actionable harassment in a *clearly* unreasonable manner.

Plaintiff asserts she was racially harassed by students while in seventh grade, and from October through December during ninth grade. Some of the allegations include racists comments made to Plaintiff or in her presence. Many of the allegations involve comments made outside of Plaintiff's presence. Some of the allegations involve comments made on social media after school hours. Plaintiff had a part in instigating a few of the issues, such as when Plaintiff undisputedly called a girl a "little slut", told her to "go fuck your dad" who just died, and said "bitch, get a life and maybe a new family."

The District took swift and decisive action against students who harassed Plaintiff. According to Plaintiff's father, "they [Defendants] investigated all complaints" made. (Ex.8 p.27:11). Each offending student was counseled about their behavior, was disciplined, and Defendants called offending students' parents to discuss their offending behavior. The discipline was effective. For the vast majority of offending students, the discipline ended the behavior the first time. For a very few repeat offenders, the second discipline was increased and the behavior or comments ended.

Defendants provided Plaintiff with supportive measures as well, including providing Plaintiff with a specific point of contact for peer related concerns and counseling support. Defendants added extra staff members to Plaintiff's class to monitor student behaviors. Defendants changed the offending students' schedules and

seats to minimize contact with Plaintiff. Defendants forced some offending students to stay away from Plaintiff. Defendants also provided Plaintiff with an adult monitor throughout the school day for protection.

As an additional response to Plaintiff's complaints, Defendants took measures to positively impact the school environment and reinforce its prohibition of discrimination and harassment. Defendants increased their discipline for harassment, to send a message to students that harassment would not be acceptable. Defendants started a student advisory group to address bullying and school culture. The Board of Education passed a resolution regarding its anti-discrimination policy. Defendants also implemented additional student and staff training related to racial/cultural sensitivity and diversity, equity and inclusion.

Plaintiff's claims fail because Defendants were not deliberately indifferent to the alleged complaints of harassment. Defendants are not required to "remedy" or "purge" its school of harassment to avoid liability. Rather, their duty is to respond to known harassment in a manner that is not *clearly* unreasonable. Far from clearly unreasonable, it is hard to imagine a school district doing more in response to Plaintiff's particular complaints than what was done here.

## ISSUES PRESENTED

1. Can Plaintiff establish a Title VI claim, where emotional distress damages are not available as a matter of law, and Plaintiff does not have contract damages?

   **NO.**

2. Did Defendants respond with deliberate indifference, or in a clearly unreasonable manner, to Plaintiffs claims of racial harassment, where Defendants disciplined all offending students with suspensions; escalated discipline as more complaints were made; provided Plaintiff with interim measures, such as individualized adult supervision and separating offending students from Plaintiff; instituted additional anti-harassment training; and adopted student programs combating harassment? **NO.**

3. Are Superintendent Gilbertson and Principal Wood entitled to qualified immunity from Plaintiff's constitutional claims? **YES.**

4. Can Plaintiff establish *Monell* liability where the District's adopted policies that expressly prohibit race harassment and discrimination, and when the Board of Education learned of the complaints, publicly denounced race harassment? **NO.**

5. Can Plaintiff establish ELCRA student-on-student harassment claim, where Defendants investigated each report and then took prompt and appropriate remedial action? **NO.**

## MOST CONTROLLING AUTHORITY

*Cummings v. Premier Rehab Keller, P.L.L.C.*, 212 L. Ed. 2d 552, 142 S. Ct. 1562, 1572, reh'g denied, 213 L. Ed. 2d 1081, 142 S. Ct. 2853 (2022), the Supreme Court found that emotional distress and pain and suffering damages are not available remedies for Spending Clause legislation, such as Title VI.

*Stiles ex rel. D.S.*, 819 F.3d 834 (6th Cir. 2016) (Not deliberately indifferent to 18 months of severe and pervasive sexual harassment that included multiple physical assaults).

*Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612 (6th Cir. 2012)(Not deliberately indifferent to three years of persistent and troubling race harassment in the high school).

*Gordon v. Traverse City Area Pub. Sch.*, 686 F. App'x 315, 325 (6th Cir. 2017).

*Doe by next friend Kolokithas v. Alpena Pub. Sch. Dist.*, __ N.W.2d __, 2022 WL 17868146, at *6 (Mich. Ct. App. Dec. 22, 2022)(ELCRA).

## STATEMENT OF FACTS

1. **Background**

   a. **The District's Policies and Training Relating to Bullying/Harassment, Discipline, and Restorative Practices Before Plaintiff's Complaints.**

Prior to the allegations in this case, the District adopted policies prohibiting racial discrimination, harassment, bullying and cyber-bullying of its students. (Ex. 5 p. 19, 30; Ex. 48). These policies defined prohibited conduct, provided students with a reporting procedure, and identified a compliance officer. (Id. at p. 42-23). Students who violated the policies were subject to discipline, up to suspension.

Starting in 2016, the District also annually provided staff with training that covered "all forms of harassment," including racial bullying and microaggressions. (Ex. 44; Ex. 13 p. 34:19, p.35:22, p.41-42). Staff were trained to identify possible racial harassment, address the situation with offending students, and then report it immediately for investigation. (Ex. 44; Ex. 13 p. 36:2-17; p. 37:11-19; p. 39:1-11.). The District added a cultural competency and racial bias module to its training in August 2020. (Ex. 44). The District then added a module on cyberbullying in August 2021. (Id.)

Students also received training regarding the District's prohibition against racial harassment and bullying. Students received a copy of the handbook that outlines the District's anti-harassment policy, the reporting procedure, and the discipline for a violation. (Ex. 20, pp 80-81.). The handbook, including sections addressing harassment

and discrimination, was reviewed directly with the students during the first couple days of school and following school breaks, as needed. (Ex. 20, p. 82:3-5; Ex. 16, p. 157: 9-14; Ex. 6, p. 46-51). Parents and students certify each year that they have received and reviewed the handbook. (Ex. 20, p. 82:1-3; Ex. 16, p. 154:21-25, p. 155: 8-15).

The District also maintained a firewall for its internet that blocked students from accessing social media on the school's internet. (Ex. 49).

### b. Michigan's Restorative Practices Requirement For Student Discipline.

There are limitations on student exclusionary discipline. In 2014, the Department of Education and the Department of Justice issued guidance requiring school districts to consider restorative practices as an alternative to suspensions and expulsions for student discipline. (Ex. 1). Studies showed that exclusionary discipline had negative educational and long-term outcomes and could contribute to the "school to prison pipeline." *Id.*

The State of Michigan responded by enacting a statute that addressed the use of restorative practices as an alternative to exclusionary discipline in public schools for student behavior, such as that at issue in this case. *See* MCL 380.1310c. The statute expressly states that "[r]estorative practices should be the first consideration to remediate offenses such as interpersonal conflicts, bullying, verbal and physical conflicts, . . . harassment and cyberbullying." MCL 380.1310c(2). The statute also provides a list of specific factors that a school must consider before determining

7

whether to suspend a student, such as the offending student's age, disciplinary history, and whether lesser interventions would properly address the violation or behavior committed by the offending student. *See* MCL 380.1310d. (Ex. 2; Ex. 3; Ex. 4).

As required by state law, the District always considered restorative practices when disciplining students for discriminatory or offensive behavior as an alternative or in addition to suspension. (Ex. 6, p. 30-33). Under the restorative practices piece the offending student would receive a cultural competency lesson related to the discriminatory language used along with a parent discussion. (Id). The goal is to educate students so that they stop the offending behavior. (Id. at 128, 100, 130-131). In very few cases the offending student will repeat the same bad behavior. The second offense will result in an escalation of consequences. (Id. at 58, 100).

## 2.     The District's Investigation and Reasonable Response to Plaintiff's Complaints of Alleged Race-Harassment.

### a.  The 2018-2019 School Year

During the 2018-2019 school year, Plaintiff was in the sixth grade at the District's middle school. During that school year, there was only one relevant report made by Plaintiff. On one occasion that school year, Plaintiff claimed that an elementary school student, WH, called her "penguin" and used the "n" word. (Ex. 7, p. 10:17-19). Plaintiff's parents reported the incident to her teacher. In response to this incident, the District contacted WH's parents to inform them of his misconduct. (Id. p. 10:15-19). The District then forced WH to write a letter of apology to Plaintiff, consistent with

Michigan's law and the District's policy on restorative justice practices. (Id.). The District's intervention with the student worked, as Plaintiff confirmed that she was not harassed by WH (or any other student) for the remainder of the school year. (Id., p. 11:25-12, p.12: 1-2, 14-20).

After this report, in 2019, the middle school staff received additional training on cultural competency, diversity and equity in conjunction with the bullying and anti-harassment training. (Ex. 6, p. 42:4-25, p. 44: 16-25).

### b. The 2019-2020 School Year

There were three complaints/reports made regarding Plaintiff during the 2019-2020 school year.

First, during the summer vacation, Plaintiff and a student named SD traded Snapchat messages. (Ex. 8, p. 19: 19-25; Ex. 7, p. 13: 20-21; Ex. 9). Plaintiff initiated a Snapchat conversation with SD after seeing she had a post that had the word "nigga" in the caption. During the conversation Plaintiff stated, "you little slut go fuck your dad like you red neck racist hillbilly you are and for your info bitch get a life and maybe a new family". SD's father had died. (Ex. 9; Ex. 7, p. 14:2, 16:2-17). On the second day of school, on September 4, 2019, SD confronted Plaintiff about Plaintiff's comment about her father. Plaintiff acted like she was going to slap SD. (Ex. 7, p. 16:20-22). SD reacted by pushing Plaintiff, ripping her shirt, and asking Plaintiff to apologize. Another student, LB, tried to break up the fight and was also pushed by SD. The Middle School Principal, Bethany Davis, stepped in and broke up the fight.

9

The District immediately investigated the incident by interviewing all student witnesses, including Plaintiff, LB and SD about the incident. (Ex. 9). SD was ultimately disciplined and given a one-day out of school suspension, ordered to write Plaintiff a letter of apology, and forced to sign a behavior contract concerning social media use which included blocking Plaintiff on social media. (Id). Plaintiff was not disciplined for the terrible things she said to SD on social media. (Id).

Additionally, the Middle School Assistant Principal, Mr. Eugster, put a no-contact order in place between Plaintiff and SD. (Ex. 7, p. 17-18). He also patrolled the halls so that SD and Plaintiff did not "get into a fight again." (Id.) Plaintiff admitted that the District's intervention with the student worked, as she did not recall any other incidents with SD following this intervention. (Id.) There were no reported incidents for the remainder of the Fall Semester.

Second, on January 22, 2020, Plaintiff learned about a rumor from another female classmate that a student named GD said she was planning to pull Plaintiff's hair and record it. (Ex. 7, p. 22:15-19; ECF No. 1, PageID 3-4, ¶ 14). Plaintiff was not in school that day and admits that she was informed of the rumor secondhand. (Ex. 7, p. 22:15). That same day, Mr. Malick reported the "rumor" to Assistant Principal Eugster. (Ex. 10). Assistant Principal Eugster immediately investigated the complaint by interviewing all of the students that Mr. Malick claimed were involved. (Ex. 11, p. 401-42; Ex. 10). Following the conclusion of his investigation, Assistant Principal Eugster informed Mr. Malick that he could not substantiate the rumor, found no credible threat

10

to Plaintiff, and warned all of the girls about their behavior. (Ex. 10; Ex. 11, p. 49:7-8, p. 51:11-12). Mr. Malick responded to Assistant Principal Eugster's email informing him that he was doing a great job, acknowledged that Plaintiff heard everything secondhand, and was comfortable with the way he handled the situation. (Ex. 8, p. 28:5-25, p. 29:1-12).

Third, on March 5, 2020, Plaintiff reported to the middle school administration that student DS made an inappropriate comment to Plaintiff, asking her if her parents were two black actors in a video the students were watching in class. (Ex. 7 p. 19: 2-3; Ex. 12). In her written statement, Plaintiff explained that the comment really hurt her feelings because she was adopted; she did not report any racial slurs. (Ex. 12). Assistant Principal Eugster immediately investigated the incident. He interviewed and obtained written statements from *ten* students. (Id). He then determined that DS's comment was possibly racially charged. (Ex. 11, p 67: 13-25, p.68:1-17). Because of this, the District suspended DS for three days, contacted his parents, forced DS to apologize to Plaintiff, and had to sign a behavior contract. (Ex. 7, p. 19:15; Ex. 12). Plaintiff testified that DS did not say anything else racial to her after this incident. (Ex. 7, p. 19:23-25, p 20:1-6).

On March 9, 2020, Assistant Principal Eugster, Ms. Davis, and Superintendent Gilbertson met with Plaintiff and her parents to discuss these incidents. (Ex. 13, p. 149:13-20). During the meeting, Mr. and Mrs. Malick raised for the first time that the "n" word was used in the hallway by students. (Ex. 11, p. 32: 22-25, p. 33:1-3; Ex. 14, p.43:1-16; Ex. 15). As Mrs. Malick confirmed, Plaintiff and her parents provided no

11

further details. (Ex. 14, p.43:1-16). Plaintiff did not identify any students that allegedly said the "n" word or any witnesses. (Id.) Plaintiff provided no specific dates or times that the word was allegedly said. (Id.) Plaintiff also did not report any of these alleged incidents to anyone at the District. (Id.) During the meeting, Plaintiff reassured the administration that she felt safe at school. (Id.)

Despite the lack of detail, Ms. Davis still tried to follow up on Plaintiff's generic report. But without more information, the administration was unable to substantiate the report. (Ex. 13, p. 154; Ex. 16, p. 46, 50, 56).

### c. The 2020-2021 School Year

The Malicks did not report any instances of racial harassment or bullying involving Plaintiff during the couple of months she attended school in person in eighth grade. On October 6, 2020, Mr. Malick informed the District that they would be homeschooling Plaintiff.

Around June 11, 2021, Mr. Malick reported to Superintendent Gilbertson that there was a picture of a middle school student on social media wearing a Confederate flag as a cape on "cape day." (Ex. 18; ECF No. 1, PageID 4, ¶ 19). Plaintiff was home-schooled at the time, so she did not personally witness this incident occur; she saw the picture on Snapchat. (Ex. 7, p. 25:4-15). Still, the middle school administration investigated the incident. Ms. Davis "immediately spoke" to the student wearing the flag about her behavior, asked the student to remove the flag, and the student complied. (Ex. 13, p. 181:1-4). The student was also counseled on why the flag was inappropriate

and unacceptable at school. This intervention remedied the situation. (Id. at p. 181: 11-17). Mr. Malick admitted that the District immediately addressed the situation and the student was counseled about her behavior. (Ex. 8, p. 46: 7-13).

### d.  The 2021-2022 School Year

During summer vacation, on June 30, 2021, Superintendent Dan Gilbertson emailed Mr. Malick and invited him to meet to discuss his concerns. (Ex. 19). There is no record of Mr. Malick responding to this email.

Plaintiff returned to the District for her Freshman year of High School. (Ex. 7, p. 27: 3-18). Just before the start of the 2021-2022 school year, the High School Principal, Kyle Wood, briefly met with Mrs. Malick. (Ex. 20, p. 17: 15-21.) During this meeting, Mrs. Malick provided Principal Wood with "some of the challenges [Plaintiff] faced in middle school and was looking for a fresh start in high school." (Id. at p. 17: 19-21, p. 21:22-25, p. 22:1-4, p. 23:10-14). Principal Wood informed Mrs. Malik that if any issues arose at the high school that she or Plaintiff should report it to a teacher, a counselor, or one of the building administrators. (Id. at p. 19:5-15, p. 24:9-12).

The high school counselor, Melody Mills, also briefly met with Plaintiff's parents before the start of the school year. (Ex. 21, p. 45-47). Counselor Mills spoke with Plaintiff's parents about her experiences generally at the middle school and discussed supportive measures that the high school could provide Plaintiff. (Id). Counselor Mills also changed Plaintiff's schedule to the extent possible, to separate Plaintiff from certain students that Plaintiff had issues with while in middle school. (Id. at p. 47-49, 59-60).

Following the start of the 2021-2022 school year, in September 2021, Mrs. Malick approached Superintendent Gilbertson at a home football game and told him "[Plaintiff] was doing fine and enjoying her time at high school." (Ex. 14, p. 50: 25, p. 51:1; Ex. 16, p. 59:4-9). Plaintiff had no reported problem from the beginning of the 2021-2022 school year until October. The relevant reports regarding Plaintiff during the 2021-2022 school year are limited to the months of October through December 2021. These reports and the District's reasonable responses are explained below.

On October 4, 2021, Mr. Malick emailed Principal Wood and Assistant Principal Burns a list of students that allegedly made harassing comments to Plaintiff in her fourth hour class about her hair style. (Ex. 22). Specifically, Mr. Malick alleged that this group of fourth hour students said they would snatch Plaintiff's "weave" and burn it. Mr. Malick explained "homecoming was coming up and [Plaintiff] got her hair done and she got a weave. And she was nervous because it doesn't look like traditional hair that she would have." (Ex. 8, p.47:10-11). Mr. Malick also alleged that another student, AS, said go to the plantation and pick cotton. (Id.).

The District immediately convened a meeting on October 5, 2021, with Plaintiff's parents to discuss the October 4th report. Superintendent Gilbertson, Principal Wood, and Assistant Principal Burns attended the meeting with Plaintiff's parents. (Ex. 6, p. 86-87; Ex. 8, p. 61:3-5; Ex. 20, p 104: 12-17).

Following this meeting, the District implemented interim measures to support Plaintiff. The District created a specific reporting procedure for Plaintiff whereby if new

14

peer incidents occurred, she was to report these incidents to Counselor Mills and Assistant Principal Burns. (Ex. 21, p.  51; Ex. 6, p. 64-65).  Counselor Mills was also made available for counseling. Plaintiff utilized this support and talked frequently with Counselor Mills during October and November 2021 regarding both peer and general counseling issues. (Ex. 21, p 50-51).

Additionally, the high school administration immediately launched an investigation into the complaints following the October 5th meeting. (Ex. 23). As part of the investigation the District interviewed Plaintiff, the alleged perpetrators, and the alleged witnesses. (Ex. 21, p. 52-53, 64-65; Ex. 6, p. 87-89). The students who were reported admitted to their conduct, but claimed they were joking with Plaintiff. They also claimed Plaintiff was participating in the joke and that she was laughing. (Ex. 23). Plaintiff admitted to laughing at the banter. (Ex. 7, p. 36:20-25, p. 37:1-4). The District did not accept their explanations, and all of the students involved were suspended. (Ex. 23). AM received a one-day out of school suspension for the comment and received parent contact. (Id at p. 16-18). CJS received a one-day out of school suspension and an office conference was held with his parents. (Ex. 23, p. 20-22; Ex. 6, p. 89:19). AS, who made the comment about picking cotton, admitted to the comment and received a two-day suspension. (Id. at p. 32-35). AS's parents were also contacted to explain his racist conduct. (Id.) HP, who believed Plaintiff was part of the joke because she "started laughing" at his comment, was still issued a one-day out of school suspension, put on a "behavior contract," and his parents were contacted regarding his behavior. (Ex. 23,

15

p. 9, 12-13; Ex. 6, p. 89:19). DP, who claimed to be close friends with Plaintiff, turned himself in. In a written statement, DP stated that it was a joke and Plaintiff "laughs when he says it." (Id. at p. 25). Consistent with the other discipline, the school issued a one-day out of school suspension, had him enter a "behavior contract," and contacted his parents. (Ex. 23, p. 26-27; Ex. 6, p. 89:19). Mr. Malick informed the administration that AR "didn't deserve a suspension" for his conduct. (Ex. 8, p. 15). After the District addressed the matter with AR, Mr. Malick stated, "he went out of his way to apologize and said he would never do it again. Since the incident, he has shown compassion and [Plaintiff] has accepted his apology and is cool with him…He has learned." (Id. at p. 14). Assistant Principal Burns also spoke with each of the above offending students and their parents to educate them in terms of cultural awareness, diversity, and inclusion, and to inform them of the consequences if the behavior continues. (Ex. 21, p. 67: 18-22; Ex. 6, p. 30).

On or around October 7, 2021, a student reported to a parent, Ms. Dunbar, that something was going to happen at a pep rally scheduled for October 8th and that people could get hurt. The student was specifically worried that student JO would bring a gun to school on October 8th. Ms. Dunbar then texted Mrs. Malick and informed her that she "thought [Plaintiff] *may* be a target" but had no information to substantiate that assumption. Following this conversation, law enforcement was contacted. (Ex. 26). The police investigated the potential threat with the full cooperation of the District. (Ex. 49). The suspected student was searched on October 8th and no gun was ever found on

16

District property. (Ex. 26). The police concluded that there was a wild rumor spreading through the High School and over social media after students saw police and EMS present at the High School when they responded to an incident involving JO. (Id.). Turns out this incident had nothing to do with Plaintiff. (Id.).

On October 11, 2021, the District had another meeting with Plaintiff's parents to discuss the prior incidents involving their daughter. (Ex. 8, p. 64). Principal Wood testified that he recalled that the meeting centered around the District listening to the Malicks' concerns, which mainly focused on rehashing "things [that] were previously brought up." (Ex. 20, p. 148-149). Even though the Malicks were unable to provide any detail regarding their general allegations, Assistant Principal Burns still investigated. In response, Assistant Principal Burns stood outside the classroom where Plaintiff was reportedly having peer issues to observe the students surreptitiously, and to determine if she could hear any of the alleged racial slurs and inappropriate language that the Malicks complained of. (Ex. 20, p. 131:17—19; Ex. 6, p.149-150; Ex. 30). She was unable to substantiate the Malicks claims.

On October 14, 2021, AS, MR, JS, and BR were allegedly talking about Plaintiff wearing a wig and "snatching her weave" during Ms. Ovell's sixth hour class. (ECF No. 1, PageID 8, ¶ 37). This was not reported to the administration until October 26, 2021, during a meeting Mr. Malick had with several District administrators. On that date he emailed Superintendent Gilbertson an anonymous student's handwritten statement that Plaintiff received from another student around the time of the incident. (Ex. 28; Ex. 8,

p. 66-67). Mr. Malick admitted that he could have reported the incident sooner but chose to wait. (Ex. 8, p.67:4-7). In response, Gilbertson immediately shared the note with Principal Wood and Assistant Principal Burns. (Id). Administration could not substantiate the anonymous allegation after investigating. Plaintiff admitted that she was not in the class where these comments allegedly occurred and did not hear the statements directly. Instead, she received an anonymous note from another student. (Ex. 7, p. 38:22, p. 39: 1-6).

The next day, October 27, 2021, Plaintiff reported that she overheard AG use the "n" word in a class. (Ex. 7, p.42:6-13; Ex. 29; Ex. 21, p. 70-75). Plaintiff confronted AG about her reported use of the word. After the confrontation, Plaintiff heard a rumor from another student that AG allegedly said Plaintiff needed to "watch out" said that "[t]he N's are going to get it[.]" (Ex. 7, p. 44:1-6). After hearing this rumor, Plaintiff confronted AG a second time. (Ex. 29; Ex. 6, p. 66). Plaintiff was not disciplined for this confrontation. (Ex. 20, p. 77-78).

The high school administration investigated Plaintiff's complaint about AG. (Ex. 29; Ex. 20, p. 158:17-24; Ex. 6, p. 67-70). Principal Wood met with Mr. Malick and Plaintiff. (Ex. 29; Ex. 20, p. 159: 19-25, p. 160:1-3). Principal Wood, Assistant Principal Burns and Counselor Mills also interviewed AG and other student witnesses. (Ex. 29; Ex. 20, p. 159:3-7; Ex. 21, p. 97-98). Following their investigation, Wood could not substantiate that the "n" word was used in school but did substantiate that AG threatened to fight Plaintiff. (Ex. 20, p. 16: 12-14, 22-25). Based on Wood's knowledge

18

of AG's past incidents, Principal Wood escalated the punishment against AG. AG received a three-day suspension for her threat. (Ex. 29). Assistant Principal Burns also spoke with AG's father and grandmother about the incident. (Ex. 6, p. 65).

The District could not remove AG from Plaintiff's fourth hour class because it was a required math class that was only offered fourth hour. (Ex. 21, p. 76; Ex. 29). So, following AG's return from her suspension, the fourth hour teacher moved AG's seats to separate AG from Plaintiff. (Ex. 7, p 46:1-18). Additional staff members were also placed in the class to supervise and monitor their interactions. (Ex. 6, p.149-150; Ex. 20, p.131; Ex. 29). The punishment and teacher support proved effective, as Plaintiff testified that she did not recall any further racial comments or threats from AG after this incident.  (Ex. 7, p.46).

On October 29, 2021, Plaintiff then complained about student WH. Plaintiff was dressed up as a blue M&M for Halloween.  Plaintiff claimed she overhead WH say, "M&Ms are white" and "not blue", referring to Eminem the rapper. (Ex. 7, p. 46: 25, p. 27: 1-7; Ex. 31; Ex. 8, p. 29). The high school administration investigated the complaint and interviewed all student witnesses. (Ex. 31). Although the student was referring to a famous rapper, and not knowingly making a racial comment, WH's parents were contacted about this perceived racial comment and he received a one-day out of school suspension. (Ex. 31). WH did not make any other racial comments after this discipline. (Ex. 7, p. 48:3-6).

i. **The District's Provided More Interim Measures for Plaintiff and Increased its Efforts to Improve the School Environment in November 2021**

In early November 2021, the District instituted additional supportive measures for Plaintiff. The District provided Plaintiff with adult supervision in the hallways and class. (Ex. 8, p. 82:14-23). Providing this adult support was a way to increase supervision and "for protection" for Plaintiff throughout her day so if comments were made the adults could intervene. (ECF No.1, PageID.9; Ex. 20, p. 11-22; Ex. 16, p. 182:11-24). Superintendent Gilbertson also increased his presence at the high school because of the complaints. (Ex.7, p.70:20).

The District also began implementing additional institutional changes in November 2021 to improve the overall school culture, and to address the specific concerns Plaintiff's family raised. On November 1, 2021, the District met with the Malicks and Mr. Watkins from the NAACP. (Ex. 8, p. 81:4-8; Ex. 32). Following this meeting, Superintendent Gilbertson started a "student advisory group" and invited Plaintiff to be part of it. (Ex. 8, p.81:9-18; Ex. 32; Ex. 33). The student advisory group was a group of 30 students developed to address school culture and student behaviors, including bullying. (Ex. 33). The group identified areas where student culture and student behavior could improve, and the group developed strategies to achieve change. (Ex. 33). The group started meeting immediately, on November 2, 2021. (Ex. 33). Mr. Malick agreed this was a positive step for the District. (Ex. 8, p. 81:9-18)

20

In mid-November 2021, the District reminded staff and students about the District's harassment policy and the importance of reporting racial harassment. On November 12, 2021, Superintendent Gilbertson sent a letter to all the District's staff stating that over the past few weeks, minority students have reported that some of their peers had made racially disparaging remarks to them, and those situations were addressed with progressive discipline and by informing offending students that the District will not tolerate harassment or discrimination. (Ex. 34). He then directed all staff to report any complaints of harassing or discriminatory behavior, and that a failure to report would result in disciplinary action. (Id). Lastly, he informed staff that they must re-read the District's anti-discrimination policy. (Id). A few days later, Gilbertson sent a similar letter to families in the District that alerted them of a recent increase of reports of racial harassment, reminded families of the District's anti-discrimination policy, and encouraged students to report harassment to the District so it can be addressed. (Ex. 45)

On November 15, 2021, the Board of Education publicly denounced racial harassment. During the meeting the Board adopted a resolution regarding its non-discrimination policy. (Ex. 35). It also publicly stated that it "unequivocally stands against all forms of unlawful discrimination" including "discrimination based on race[.]" The Board affirmed it "stands against racism, and all forms of unlawful discrimination." The Board reiterated and republished its existing nondiscrimination policy. It further instructed all unlawful conduct reported "shall be dealt with in the appropriate manner"

through an investigation with the goal to remedy the conduct. (Id).

The District added additional staff and student training aimed at improving the school culture. In direct response to the complaints received about racial harassment, in October and November of 2021, the District began researching *additional* training it could implement to combat racial harassment. (Ex. 42, pp. 23-25.) The District reached out to SafeSchools, which provided the staff training, to provide additional training on racial discrimination and explicit and implicit biases. (Id., p. 23: 1-9). The District also sought additional training for students on positive behaviors, respect for others, and anti-bullying education. (Id., p. 24: 1-9). And the District communicated with the Michigan Department of Education about Navigate 360 for students, a MDE supported group. (Id. at24:18-24).

As a result of these efforts, by December 9, 2021, the District added multiple trainings, including a "Cultural Competency and Racial Bias" training, which targeted staff understanding and awareness of implicit racial bias, and "Diversity, Equity, and Inclusion Awareness training for Employees." (Ex. 42, p. 26: 1-13; p. 28:12-17; Ex. 43). By January 2022, the District implemented the Growing Leaders Program or Habitudes for students. (Ex. 20, p. 27: 6-25)[1]. This social emotional learning (SEL) based program was taught to students twice a month in class through the end of the school year. (Ex.

---

[1] The District began researching additional programs to improve the school climate in Fall 2021. It began creating the Growing Leaders Program/Habitudes in September 2021 which was then implemented fully at the beginning of the Winter Semester. (Ex. 46).

46; Ex. 20 p. 34-37; Ex. 6, p. 30:11-14). The program focused on teaching students to be leaders though educating students on being self-aware and respectful to all people of all backgrounds, colors, shapes and sizes. It contained various lessons that focused on inclusion and addressed bullying. (Ex. 21, p. 117:23-25, p.118:1; Ex. 20, p. 37: 14-25, p. 38:10-18). When building this program, the District selected Habitudes' modules that specifically addressed topics and challenges raised in Plaintiffs' complaints. (Ex. 20, p.38, 41:6-24). The District later added a module on Celebrating Diversity at its elementary schools so that these lessons were taught to students at an earlier age. (Id.). The Civil Rights Compliance Officers also participated in training specifically on racial discrimination. (Ex. 42, p. 26:1-13, p. 28: 12-17).

The District implemented a positive thinking program called "THINK", to promote kindness at school. (Ex. 20, p 49:14-50:3). This acronym was posted in every classroom for teachers to review with students when inappropriate conversations or misbehavior occurred. (Id., at Lines 21-25). Supporting this effort, a group of students from the high school's Making Visions a Reality course, a leadership class, designed and painted a mural in a hallway of the high school that said, "Be the 'I' in Kind". (Id., p. 52-53).

The District also started to add additional social workers to its staff. (Ex. 42, p. 30-31).

### ii. In November 2021, the District Escalated Discipline for Peer Harassment

Starting in November 2021, the District escalated discipline for offending students that were found to have harassed, bullied, or otherwise discriminated against any student to get the message across that the behavior would not be tolerated.

On November 8, 2021, Mr. Malick made Superintendent Gilbertson aware that one of the paraprofessionals assigned to walk with Plaintiff in the halls allegedly made an inappropriate comment regarding Plaintiff. (ECF No. 1, Page ID 10, ¶ 50; Ex. 36). The District immediately investigated. (Ex. 36). The investigation revealed that the paraprofessional did not make the reported comment directly to Plaintiff but did make a comment about Plaintiff to another co-worker. (Ex. 36). Still, the District contacted the paraprofessional's third-party employer, and she was removed from the building. (Ex. 16, p 183 – 184; Ex. 36).

The District learned of inappropriate comments made in a student run social media chatroom. The chat group was only students and no teacher participated in it. (Ex. 7, p. 52:15-25, p. 53:1-2; Ex. 49). The chatroom exchange also occurred outside of school hours and was not school sponsored.  (Ex. 20, p. 153:7; Ex. 16, p. 188:16-25; Ex. 49).  A student, TW, made a political comment in the chat and then referred to Obama as a "stupid nigger". (Id). Multiple students in the chat scolded TW for his use of the racial slur. (Id). Plaintiff was not part of the chatgroup.

Despite being a private chat and not school sponsored, (Ex. 20, p. 242:8-21), the

District investigated the report. (Id. at p. 146:3-4). Ultimately, the District issued an escalated discipline of five-days to student TW for his off-campus statement and contacted his parents. (Ex. 27). Principal Wood also issued a letter to parents of students in the civics class to notify them of the racially inappropriate language used in the private chatroom, and to encourage students and parents to report any inappropriate comments. (Ex. 47).

Plaintiff reported on November 19, 2021, that student SS told a group of students she was with that he "hate[d] all you black bitches." (Ex. 7, p. 54:20, p. 55:1-8). Plaintiff had previously been friends with SS. (Ex. 7, p. 57:21-25, p. 58: 1-2). SS was fearful of what the school would do to him for his conduct, and begged Plaintiff not to report him. (Ex. 7, p.55:21-25). The high school administration investigated her report, which included meeting with Plaintiff and Mr. Malick, interviewing SS, and interviewing the other witnesses. Following the investigation, the District contacted SS's parents and issued the escalated discipline of a five-day out of school suspension. (Ex. 37). Teacher, Mrs. Pilant also moved SS'S seat to keep SS separated from Plaintiff in class. (Ex. 37:20). Plaintiff confirmed that after his suspension SS did not make any further racial comments to her. (Ex. 7, p. 56:24-57:2, p. 58: 3-7).

After SS was suspended, on November 26, 2021, a third-party contracted substitute teacher, Karen Kovac, asked where he was. Plaintiff told her he was suspended for saying racial slurs. (Ex. 7, p. 61: 8-18). Ms. Kovac stated in response that someone who was racist was not bad. (Ex. 38). The District investigated her response,

issued a written reprimand for her file, informed her employer of the discipline, and never used her as a building substitute again. (Ex. 38; Ex. 20, p. 237:1).

The high school administration received a report from Mr. Malick on December 7, 2021, that student BR posted a picture of himself wearing a "silky" or do-rag to social media. (Ex.8, p. 108:21-24). Plaintiff did not see BR with it on but learned of it secondhand from another student. Principal Wood informed Mr. Malick that the school would conduct an investigation into BR's social media post. (Ex. 39). Following the investigation, Principal Wood issued a two-day out of school suspension. (Id). Superintendent Gilbertson notified Mr. Malick that the code of conduct was applied. (Id).

The last instance the District received a report occurred on or around December 8, 2021. Mr. Malick made a complaint about a teacher, Scott Coats. (Ex. 8, p. 116: 16-23). Plaintiff did not have Coats as a teacher and did not hear any of the comments. (Ex. 7, p. 53:9-12). The District investigated the complaint and interviewed several students determining that Coats permitted classroom discussion on current events that was not aligned with his teaching subject. (Ex. 20, pp. 248-251; Ex. 42, p. 38:9-25 – p. 41:1-3). As a result of the investigation, Coats received a "formal reprimand" and was placed on an "IDP" – an individualized development plan – for one year. (Ex. 42, p. 39:1-9; Ex. 17). The IDP included specific instructions for how to guide curriculum discussion as well as monitoring. (Id.).

### iii.   Plaintiff was Not Disciplined for Similar Offenses in November and December 2021

At the end of November 2021, Student SS claimed that Plaintiff hit him multiple times during fourth hour. (Ex. 40). Then during December 2021, another student WA, reported that Plaintiff threatened to slap him during sixth hour. (Id). The District investigated both of these reports. Both Plaintiff and Mr. Malick denied these incidents. (Ex. 7, p. 65:13; Ex. 8, p. 108). Plaintiff did not receive any discipline.

On December 7, 2021, a parent reported to the high school administration that she overheard students TB and KM, who are biracial, **and Plaintiff,** repeatedly using the "n" word casually in a hallway at school. (Ex. 41; Ex. 14, p. 157:7-19). When Mr. Kosal spoke to the group, Plaintiff admitted to him that they said the "n" word. (Ex. 41). KM later provided a written statement and admitted that she and Plaintiff were "saying it" but and not yelling "n-word" out loud like TB. (Ex. 41). Although KM admitted Plaintiff was repeatedly using the "n word" casually in the halls, Plaintiff denied it, and she was not punished.

### 3.   The Ongoing Efforts to Combat Racial Harassment in the High School After Plaintiff Left the School

Two months later, on February 11, 2022, Plaintiff left in person learning and decided to go to school virtually. (ECF No. PageID.14, ¶ 75).

The District continued its efforts to combat racial harassment after Plaintiff's complaints ended. In June 2022, the District offered student online training that

included diversity, equity, and inclusion topics. (Ex. 20, p. 53:24-25, p. 54:1-3). In August 2022, Superintendent Gilbertson took a class on Anti-Racist Trauma Informed Practices for K-12 Education. (Id.). The District's administrators all took a Diversity, Equity, and Inclusion Training that August as well. (Id.). Going into the 2022-23 school year, a new cultural competency module was implemented and used when students received discipline for harassment or any use of discriminatory language. (Ex. 6, p. 30:15-25). The high school implemented Navigate360 (recommended by MDE), to work with students that have been involved in racist comments. (Ex. 21, p. 104: 4-9).

### 4.    Plaintiff's Generalized Complaints.

Plaintiff also claimed that while she was in high school she generally witnessed confederate flag and American flag paraphernalia, and overhead the "n word" "everyday" in school. (Ex. 7, p.102). Plaintiff could not identify any specific incidents occurring or any details. Plaintiff could not identify any particular offending students. And Plaintiff could not recall specific reports she made to Defendants. (Id. at p.103-115). Plaintiff ultimately admitted that she did not report each incident, but instead kept a 'tally' going in her head. (Id. at p.103-115, 131).

## LEGAL ARGUMENT

## I.    PLAINTIFF'S TITLE VI CLAIM SHOULD BE DISMISSED.

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d,[2] prohibits race

---

[2] Plaintiff's parents cannot be parties as a matter of law because they are not the

discrimination in "any program or activity receiving federal financial assistance." It provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

Plaintiff's Title VI claim should be dismissed for multiple alternative reasons.

### 1. Plaintiff Has Not Established Damages Under Title VI.

Plaintiff's request for emotional distress or pain and suffering damages as well as for punitive or exemplary damages fail as a matter of law. In *Cummings v. Premier Rehab Keller, P.L.L.C.*, 212 L. Ed. 2d 552, 142 S. Ct. 1562, 1572, reh'g denied, 213 L. Ed. 2d 1081, 142 S. Ct. 2853 (2022), the Supreme Court found that emotional distress and pain and suffering damages are not available remedies for Spending Clause legislation, such as Title VI. *See also, Mojsoski v. Indiana Wesleyan Univ.*, No. 1:22-CV-00019-SLC, 2022 WL 17338426, at *12 (N.D. Ind. Nov. 30, 2022)("statutes creating causes of actions

---

intendent beneficiaries of Title VI. *Wise v. E. Grand Rapids Dep't of Pub. Safety*, No. 1:20-CV-1262, 2022 WL 4124948, at *5 (W.D. Mich. Aug. 1, 2022) (collecting cases) ("parents are not the intended beneficiaries of school programs and, therefore, may not assert Title VI claims on their own behalf."). Their claim should, therefore, be dismissed.

There is also no individual liability under Title VI, so claims against Principal Wood and Superintendent Gilbertson should be dismissed. *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1356 (6th Cir.1996).

The school board of education is not a proper party because the District and the Board of Education are not separate legal entities for purposes of filing suit. *See Johnson v. Knox Co. Schools*, 2022 WL 18283265, *4 (E.D. Tenn. Nov. 10, 2022); *see also* MCL 380.11a(5)(stating that public school districts shall be governed by a school board).

against federal funding recipients under the Spending Clause, such as Title VI, are akin to breach of contract claims for which emotional distress damages are not available.")(*citing Cummings, supra* at 1570-1572); *see also K.G. v. Woodford Cnty. Bd. of Educ.*, 2022 WL 17993127, at *3 (E.D. Ky. Dec. 29, 2022)(in dismissing Title IX claim based on lack of recoverable damages based on *Cummings*, finding, "traditional contract remedies are available in private actions brought pursuant to Title IX, but emotional distress damages are not recoverable").

Moreover, "punitive damages may not be awarded in private suits brought under Title VI of the 1964 Civil Rights Act." *Barnes v. Gorman*, 536 U.S. 181, 189 (2002). Thus, any claims for emotional distress, pain and suffering, or punitive damages should be dismissed.

Further, Plaintiff CM does not allege or have any breach of contract damages. See Ex. 14, p. 176 (no expenses paid for therapy or counseling). Therefore, Plaintiff does not have any damages available under Title VI, so her claim should be dismissed as moot. *See Aspen Specialty Ins. Co. v. Proselect Ins. Co.*, No. 21-11411, 2021 WL 5919062, at *8 (E.D. Mich. Dec. 15, 2021)(finding claim moot when no damages available); *see also K.G. v. Woodford Cnty. Bd. of Educ, supra* (dismissing a student's Title IX based on emotional distress injuries only, and not contract damages, because "[e]motional harm standing alone is not a redressable Title IX injury.").

## 2. Plaintiff Also Has Not Plead or Proven That the District Intentionally Discriminated Against Plaintiff.

"Title VI targets intentional discrimination only." *Foster v. Michigan*, 573 F. App'x

377, 388 (6th Cir. 2014)(citing *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)).

Because they are nearly identical Spending Clause statutes, courts have analyzed

Title VI student harassment claims the same as Title IX claims under *Davis v. Monroe*

*Cty. Bd. of Educ.*, 526 U.S. 629 (1999). *Doe v. Herman,* 2021 WL 1967558 *4 (M.D. Tenn.

May 17, 2021). In *Davis*, the Supreme Court recognized that student-on-student sexual

harassment can give rise to Title IX liability, but only "in certain limited circumstances."

Id. at 643. In *Davis*, the Court found that a school cannot be held liable under a theory

of *respondeat superior*. *Davis*, 526 U.S. at 645. Rather, *Davis* conditioned recovery on a

school's own actions in response to known acts of actionable harassment. The Court

found that a school district may only be liable if its deliberate indifference to known

acts of actionable harassment "effectively caused" the student to experience "further

sexual harassment" that is "so severe, pervasive, and objectively offensive that it can be

said to deprive the victims of access to the educational opportunities or benefits

provided by the school." Id. at 642-43, 650.

Thus, a school is liable for student-on-student harassment under Title VI if the

student pleads and ultimately proves: (1) racial harassment that "was so severe,

pervasive, and objectively offensive that it could be said to deprive the plaintiff of access

to the educational opportunities or benefits provided by the school"; (2) the school

"had actual knowledge of the [racial] harassment"; and (3) the school "was deliberately indifferent to the harassment." *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012); *see also Kollaritsch v. Mich. State Univ. Bd. of Trustees*, 944 F.3d 613, 619-20. (6th Cir. 2019).

To start, the standard for actionable conduct under Title IX is much higher than under Title VII. *See Davis*, 526 U.S. at 653; *see Hoffman v. Saginaw Pub. Sch.*, 2012 WL 2450805, at *6 (E.D. MI. 2012). This is because "[c]ourts…must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Davis*, 526 U.S. at 651. "[S]tudents are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." Id. at 651-652.

To be actionable, the harassment must be severe **AND** pervasive **AND** objectively offensive race-based harassment. *Kollaritsch*, 944 F.3d at 621. "'Severe' means something more than just juvenile behavior among students, even behavior that is antagonistic, non-consensual, and crass… 'simple acts of teasing and name-calling' are not enough, 'even where these comments target differences in [race].'" *Id.* citing *Davis*, 526 U.S. at 652. "'Pervasive' means 'systemic' or 'widespread.'" *Id.* Occasional use of the "'N word' and other racially demeaning terms" on their own does not satisfy the severe and pervasive standard. *See Smith v. Leggett*, 220 F.3d 752 (6th Cir.

2000)(interpreting the lower Title VII standard).

"Although it is possible to assert a Title IX claim based exclusively on verbal harassment, it is uncommon, because courts tend to consider verbal harassment to be less severe than physical harassment." *Doe v. Plymouth-Canton Cmty. Sch.*, No. 19-10166, 2022 WL 1913074, at *8 (E.D. Mich. June 3, 2022). And "indirectly hear[ing] some of the verbal harassment at issue in this case is important to the analysis of its severity and pervasiveness"; it is even less likely to meet the high standard. Id. In *Plymouth-Canton*, the Court found that ten reports of stalking and verbal harassment, which included repeatedly telling the student rape victim that she should get raped again, and one incident of physical assault over a one-year period did not meet the high standard of severe and pervasive harassment. Id. In this case, most of Plaintiff's claims are of verbal harassment she learned of secondhand.

Plaintiff must also prove that the District had "actual knowledge" of the incident of actionable harassment. *See Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 621 (6th Cir. 2019). In *McCoy v. Bd. of Educ.*, 515 F. App'x 387, 392 (6th Cir. 2013), the Sixth Circuit recognized the importance of the actual knowledge requirement, stating "there is a connection between what school officials know and whether their response is clearly unreasonable."

The main issue here is whether Defendants were deliberately indifferent to known acts of actionable harassment.

33

## A. Plaintiff's Harassment Allegations That Are Not Actionable As A Matter Of Law.

Generalized, "vague" claims of racial slurs, without sufficient details, are not actionable. *See Gordon v. Traverse City Area Pub. Sch.*, 686 F. App'x 315, 325 (6th Cir. 2017). Plaintiff generically claims that students randomly used racial slurs at school. Plaintiff has not identified any details regarding these claims, such as the identity of the offending students, when the incidents occurred, specifically what occurred, and to whom she made a report. Because of the absence of those details, those claims are not actionable. In *Stiles ex rel. D.S. v. Grainger Cnty., Tenn.,* 819 F.3d 834, 843, n.5 (6th Cir. 2016), the Sixth Circuit found that nearly identical vague complaints of student-on-student harassment, without details about the incidents or reports, are not actionable. In *Gordon v. Traverse City Area Pub. Sch.*, 686 F. App'x 315, 325 (6th Cir. 2017), the Sixth Circuit also dismissed similar complaints because the plaintiffs "offer[ed] no details on the nature of this additional harassment, when it occurred, or how [the defendant] responded," finding that, "these missing pieces doom [their] case". Similarly, Plaintiff's vague claims about the generic use of slurs without accompanying details are not actionable.

Moreover, in determining whether Plaintiff experienced a hostile environment, a court may only consider conduct that occurred in the school. It is well established that a school district can be held liable for "harassment only where the school 'exercises substantial control over both the harasser and the context in which the known

34

harassment occurs.'" *Gordon*, 686 Fed.Appx. at 324; *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir.2003). "A school district ... exercises substantial control over the circumstances of the harassment when it occurs 'during school hours and on school grounds.' " *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 (2d Cir.2012)(quoting *Davis*, 526 U.S. at 646). Conduct occurring outside of school, such as on social media, is not actionable under Title IX. *Gordon*, 686 Fed.Appx. at 324. In *Gordon*, the Sixth Circuit found that the school district was not liable for online harassment because it occurred outside of school. Id. In *Ball v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 2:20-CV-2681, 2022 WL 594799, at *8 (S.D. Ohio Feb. 28, 2022), when dismissing claims of racial slurs made after school and on Snapchat, the court held that "[w]hen an incident occurs off campus and outside school hours, the school does not exhibit substantial control over the harasser and the context. Those actions cannot be used as evidence of deliberate indifference."

Similarly, allegations in this case related to off campus speech in group chats and on social media outside of the District's control (the District has a firewall that blocks social media access using the school's internet) are not actionable. So, AG's use of the N-word on social media during summer vacation, the student's comment about President Obama in the civics chat room, and allegations about the use of the N-word on Snapchat are not actionable under Title VI because they occurred outside of the school.

Finally, Plaintiff's parents' testimony about incidents of alleged race harassment

35

they did not witness are not actionable. That is inadmissible hearsay and cannot be considered as part of the analysis on summary judgment. *Stiles,* 819 F.3d at 846. The Sixth Circuit directly addressed this issue in *Stiles*: "Stiles's (the mother) testimony regarding these incidents is inadmissible to the extent it is hearsay—that is, the testimony is based on statements DS made to her rather than her personal knowledge. *Stiles,* 819 F.3d at 846, *citing N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir.1997)." Similarly, Plaintiff's parents' hearsay testimony as to the substance of alleged incidents they did not witness is inadmissible.

## B. Defendants Were Not Deliberately Indifferent To The Known Acts of Actionable Harassment.

To hold Defendants liable for peer harassment under *Davis,* it is not enough for Plaintiff just to establish race harassment. Plaintiff must also establish that Defendants responded to known complaints of race harassment with deliberate indifference.

Deliberate indifference is a "high bar" that only requires that school administrators respond to known student-on-student harassment in a manner that is not "clearly unreasonable in light of the known circumstances." *Stiles*, 819 F.3d at 848.

The modifier "clearly" is important. It means that deliberate indifference is "not a 'mere 'reasonableness' standard.'" *Stiles*, 819 F.3d at 848. Thus, a showing of negligence, or even "a collection of sloppy, or even reckless, oversights," does not suffice. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996). "[N]egligent delays, botched investigations of complaints due to the ineptitude of investigators, or responses

that most reasonable persons could have improved upon do not equate to deliberate indifference." *I.F. v. Lewisville Indep. Sch.,* 915 F.3d 360, 369 (5th Cir. 2019).

To evaluate deliberate indifference, courts are to "ask not whether the school's efforts were ineffective but whether they amounted to 'an official decision … not to remedy the violation.'" *Foster*, 982 F.3d at 968. "Ordinarily, 'deliberate indifference' means that the defendant both knew and consciously disregarded the known risk to the victim." *Kollaritsch,* 944 F.3d at 621. This Court observed, "[i]n cases in which plaintiffs established deliberate indifference based on the funding recipient's investigation, the school **did not investigate at all** or **stopped investigating** for months." *Doe v. Plymouth-Canton Cmty. Sch.*, No. 19-10166, 2022 WL 1913074, at *11 (E.D. Mich. June 3, 2022). Conversely, a plaintiff fails to show deliberate indifference where "the school's disciplinary and remedial responses were reasonably tailored to the findings of each investigation." *Gordon v. Traverse City Area Pub. Sch.*, 686 F. App'x 315, 324 (6th Cir. 2017).

The "clearly unreasonable" standard is intended to afford flexibility to school administrators. *Davis*, 526 U.S. at 648. As such, courts have identified certain guideposts on the deliberate indifference standard. First, school administrators are not required to "remedy" or "'purge their schools of actionable peer harassment' or 'engage in particular disciplinary action' to avoid Title IX liability." *Stiles*, 819 F.3d at 848.

The Sixth Circuit has clarified that the occurrence of further harassment after responding to actionable harassment is not enough by itself to establish deliberate

indifference. *Kollaritsch*, 944 F.3d at 622. For example, in *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 365 (6th Cir. 2012), no deliberate indifference was found where, in response to initially addressing reports of sexual misconduct, the accused student committed a sexual assault. *See also M.D. v. Bowling Green Indep. Sch. Dist.*, 709 F. App'x 775, 777 (6th Cir. 2017)(no deliberate indifference where multiple incidents of stalking after sexual assault was addressed); *Stiles*, 819 F.3d at 848 (no deliberate indifference for multiple physical assaults after verbal sexual harassment addressed); *Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612 (6th Cir. 2012)(no deliberate indifference to at least three years of ongoing abhorrent racial harassment after the district addressed initial complaints). The key is not continuing to *only* use the same methods to respond to actionable harassment that the school knows is ineffective. *Vance v. Spencer Co Pub Sch Dist*, 231 F3d 253, 261 (6th Cir 2000).

Further, "victims of peer harassment" do not "have a Title IX right to make particular remedial demands." *Davis*, 526 U.S. at 648. Instead, "[a]ssessment of the need for, and the appropriate means of maintaining, school discipline is committed generally to the discretion of school authorities." *Ingraham v. Wright*, 430 U.S. 651, 681-82 (1977). The Court has also warned that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648. It is also important to recognize that the "deliberate indifference" standard acknowledges the "legal constraints on [school administrators'] disciplinary authority" to respond to peer harassment. *Davis*, 526 U.S. at 649. The Sixth Circuit acknowledged that "[o]ne student's

demand for a quick response to her harassment complaint will conflict with the alleged harasser's demand for due process," putting the school in a position where it is "beset with litigation from every side." *Kollaritsch,* 944 F.3d at 627 (6th Cir. 2019).

*Stiles ex rel. D.S.*, 819 F.3d 834 (6th Cir. 2016) confirms that Plaintiff's peer harassment claims should be dismissed. *Stiles* involved one-and-a-half years of constant sex-based name-calling, harassment, and occasional physical assaults from multiple different students; longer, more pervasive and more physical than what Plaintiff alleges here. In *Stiles*, the student plaintiff was directly called "bitch," "faggot," and "queer" almost every day in seventh grade, and several times a week in eighth grade. The plaintiff also reported multiple specific incidents in class when multiple students harassed him and called him "gay", "homo", "queen of hearts", and "blowjob." The plaintiff was assaulted on at least four occasions. One of the physical assaults involved two students attacking the plaintiff in the bathroom, punching him in the stomach, and kicking him as he lay on the floor. The plaintiff suffered a compression fracture, wedging vertebra and back pain from another assault.

Although the harassment continued over such an extended period, and the school district was unable to stop the harassment, the Sixth Circuit still found that the school district was not deliberately indifferent. The Court reasoned that the school district investigated *almost* every incident that was reported, and each offending student was disciplined by a warning to short term suspension, depending on the severity of the allegations. That is nearly identical to what the District in this case did; the District here

imposed suspensions on all offending students. Also nearly identical to what the District here did, the school district in *Stiles* also separated the plaintiff in class from students known to bother him. And, near the end of the allegations, the school ultimately hired a substitute teacher to monitor the plaintiff; as was done in this case.

The Sixth Circuit held, "[o]ne-and-a-half years of similar, but not rote, responses to incidents that each involved a different student or group of students do not amount to clearly unreasonable conduct . . . [and] it bears repeating that within this time period Defendants varied the punishment to reflect the perceived seriousness of each incident in the characteristics of each perpetrator." 819 F.3d at 851. "Although the school's efforts did not end DS's problems, Title IX does not require school districts to eliminate peer harassment." Id.

The school district's response to harassment in *Stiles* (that continued for a longer period of time and was far more physically violent) mirrors the District's response in this case. In this case, nearly all of the complaints the District responded to related to verbal harassment. More than half of those allegations related to comments Plaintiff learned of secondhand. Many of the comments did not relate to Plaintiff. A large number of the complaints, such as those about Plaintiff's hair (which is a sizeable number of the reports) and about an M&M costume, are ambiguous and may not even be racially motivated. *See McCoy v Bd of Educ*, 515 Fed Appx 387, 392 (6th Cir. 2013)(holding that a reasonable response is proportionate to circumstances); *Doe v. Plymouth-Canton Cmty. Sch.*, 2022 WL 1913074, at *8 (E.D. Mich. June 3, 2022)("courts

tend to consider verbal harassment to be less severe than physical harassment.").

Much like in *Stiles*, in response to these particular reports, the District here promptly "investigated all complaints" made. (Ex. 8, p.27:11). The District interviewed Plaintiff and other witnesses that were identified during the investigations. If the investigation substantiated the complaint, appropriate discipline under the circumstances was issued. Most offending students were suspended, their parents were contacted, and counseled with sensitivity training or behavioral contracts. For the vast majority of the students, the discipline ended the offending behavior the first time. For the very few repeat offenders, when a second escalated form of discipline was issued the behavior or comments ended. While Plaintiff may have desired a different level of discipline, she cannot make particular demands and it is well-established that "courts should avoid second-guessing school administrators' disciplinary decisions. *Stiles*, 819 F.3d at 848 (citations omitted).

The District also escalated student discipline as time progressed. The District issued 1-3 day out of school suspensions initially. (See, e.g., Exhibits 14, 24, 34). But then as more complaints were received the District increased the discipline progressively to 5-day suspensions. (See Exhibits 44, 46).

As in *Stiles*, the District here also implemented many supportive measures. The District changed Plaintiff's class schedule to separate her from other students. Teachers also changed class seating to separate Plaintiff from other students she complained about. District staff was provided to support Plaintiff in hallways and classrooms to act

as "security detail." Counselor Mills and Assistant Principal Burns were also available at any time for Plaintiff to come talk to or report any complaint.

The District here went well beyond the school in *Stiles*, and instituted proactive measures to address the school environment. Superintendent Gilbertson started a "student advisory group" in which Plaintiff participated to address bullying and school culture. (Ex. 33). The Board publicly issued a formal Resolution in response to Plaintiff's concerns at the November 15, 2021, Board meeting, admonishing racial harassment and bullying. (Ex. 35). Then in November 2021, Superintendent Gilbertson sent a letter to all the staff and families and the District reminding them of the District's anti-harassment policies, the need for students to treat each other with respect, and to inform families of new training and programs for students aimed at treating each other with respect. (Ex. 20, p.199, 221; Ex. 34; Ex. 45). The District implemented a positive thinking program called "THINK" to promote kindness at school.

Also in excess of what occurred in *Stiles*, the District also added new staff and student training in response to Plaintiff's complaints, in addition to what was previously provided. (Ex. 44; Ex. 43). In direct response to Plaintiff's complaints, in December 2021, the District added additional training on cultural competency, diversity and equity, with its bullying and anti-harassment training, and by January 2022, training on a new Social Emotional Learning program.

Underscoring its commitment to bringing about a racial harassment free school environment, the District continued to add to its training, even after Plaintiff left the

District. The District added a training module on Celebrating Diversity, Superintendent Gilbertson took a Anti-Racist Trauma Informed Practices class in August 2022, administrators took additional Diversity, Equity, and Inclusion training in August 2022, and in the 22/23 school year, a new cultural competency module was implemented.

In short, the District here did far more in response to student harassment than the school in *Stiles* did. If the school in *Stiles* was not deliberately indifferent to more pervasive, severe, and physical allegations of harassment that went on for a longer period of time, the District's responses here cannot be considered deliberately indifferent.

These responses also compare favorably to the school administration's responses to *far* more severe racial harassment in *Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612 (6th Cir. 2012). There, the Sixth Circuit found the administrators' responses were not deliberately indifferent. *Williams* involved very troubling allegations of longstanding race harassment in the high school. From 2003 to 2006, the high school "was fraught with racial tension." KKK and white supremacist paraphernalia was found at school. African American students were regularly directly called the "n word." This included specific incidents where students were directly told, "fuck you, fat n*gger," "I beat N*ggers to death", and "die bitch n*gga." Confederate flags were drawn on textbooks, used as graffiti around school, found on student's clothing, and depicted on students' cars. A racist poster was found on a student's locker that read, "Rebel—The south will rise—Death to all N*ggers." The "n word" was used regularly in class, and teachers would

43

not stop it. One student was regularly called a n*gger, which often resulted in physical violence. Racist slurs were scribbled on African American students' lockers. Multiple hit lists were found, one that specifically identified killing specific African American students and another that contained threats to kill African Americans and "kill all the little n*gglets." More shocking conduct occurred beyond this.

Despite such deplorable, racist threatening conduct, the Sixth Circuit found that the two administrators responsible for overseeing the high school were not deliberately indifferent to the harassment—even though that conduct continued to persist. One of the administrators took many of the same actions that the District in this case did. The administrator ordered the removal of racist graffiti and Confederate flags, set up surveillance, participated in a group dedicated to the improvement of the community, gave a presentation about inappropriate behavior, held an assembly for students about treating each other with respect, expelled a student, investigated reported incidents, and told minority students to report harassment. The Sixth Circuit brushed aside criticisms that this administrator failed to discipline all offending students, delayed in taking action for harassment, and did not always meet with students who overheard or were the subject of racial slurs. The Sixth Circuit found that given this administrator's "numerous, varied responses to the racial harassment, he met the low threshold necessary to show that he was not deliberately indifferent to the racial harassment at the school." Id. at 620.

The Sixth Circuit also found that the other administrator, who took far less

44

action, was also not deliberately indifferent. This was so even though the plaintiffs contended he was openly hostile to requests for action to address the complaints, though there was an indication he still did respond. The Sixth Circuit found, "[j]ust as the plaintiffs 'do not have a right to particular remedial demands,' the law does not require that [the administrator] has to have a pleasant demeanor." Id. at 620.

Other recent decisions compel the conclusion that the District was not deliberately indifferent. In *Hill v. Blount Cnty. Bd. of Educ.*, 203 F. Supp. 3d 871 (E.D. Tenn. 2016), an Asian student sued under title VI alleging he was subjected to constant harassment based on his race for over a year, before leaving the school due to the harassment. Students called him racial slurs such as "chink" and "pencil dick," and told him to "go home to your country." A group of students repeatedly accused the plaintiff of eating a cat. This followed with additional cat comments, slant-eye gestures, and attempts to speak in an Asian accent. A student threatened the plaintiff in a text message after being reported. Later, additional students drew cartoons showing the plaintiff eating cats. The plaintiff was subjected to regular racial slurs and racial comments during soccer practice. The plaintiff was also physically assaulted in the locker room during basketball practice, and called a bitch and an Asian pussy, and a student threatened to beat the Asian out of him.

The court dismissed the Title VI claim finding that the school district was not deliberately indifferent to the complaints. The Court found that the school promptly investigated the complaints. When allegations were substantiated, those students were

disciplined with a verbal reprimand, counseled with sensitivity training, and their parents were contacted. Additionally, the school offered the plaintiff a plan to meet with a counselor to discuss racial harassment and encouraged him to report incidents. Although the plaintiff criticized the extent and substance of the school district's training, the court was satisfied that principals and teachers received in-service training at the beginning of the school year, and students were given a student handbook, which included the schools nondiscrimination policy. The court reasoned that all this showed that the school fulfilled its Title VI obligations responding to plaintiff's claims of a racially hostile environment, even if the harassment continued.

The court in *Ball v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 2022 WL 594799 (S.D. Ohio Feb. 28, 2022), recently dismissed a Title VI claim involving "deeply offensive racial conduct" by multiple different students because the school district was not deliberately indifferent. In *Ball,* an African American student endured nearly four years of racial harassment while in high school. The allegations included a white student making comments over a seven-month period about the student being from the ghetto and eating watermelon; the cross-country team that the student participated in mocking black culture; a group text thread among students included racially derogatory texts, including statements like "the guerrillas are on the loose"; an incident where a student wrote on a bathroom stall "death to all n*gger and n*gger lovers"; and multiple incidents of the plaintiff being called "n*gger", hearing students yell n*gger in the hall, and students using the slur n*gger on social media.

46

Despite the obvious racially offensive conduct, the school district was not liable under Title VI because it was not deliberately indifferent to each of the reports that were made. The court reasoned that the school district investigated every complaint made. When the offending student could be identified that student was disciplined, though not always with a suspension. The board also made a change to its race harassment policy to make it mandatory to issue discipline for using racial slurs. Previously the policy just made it permissible to discipline students for the use of racial slurs.

If the schools' responses to the far more pervasive harassment in the above cases did not amount to deliberate indifference, then the District's responses in this case are not clearly unreasonable.

While Plaintiff may call for more action taken against students, "victims of peer harassment" do not "have a Title [VI] right to make particular remedial demands." *Davis*, 526 U.S. at 648. It is also important to remember the due process rights afforded to students. *Doe v. Miami Univ.*, 882 F.3d at 592. The District could not simply expel students just to placate Plaintiff. This would violate student's rights and expose the District to liability. The Sixth Circuit has made clear it "will not place governmental actors in a Catch 22 situation by imposing … liability for failure to do an act that might itself have exposed the actor to liability on another theory." *Hunt v. Sycamore Cmty. Sch. Dist.*, 542 F.3d 529, 542 (6th Cir. 2008).

And the fact that the alleged harassment did not end does not lead to a

conclusion of deliberate indifference. Schools are not required to "remedy" or "'purge their schools of actionable peer harassment' or 'engage in particular disciplinary action' to avoid Title [VI] liability." *Stiles*, 819 F.3d at 848.

With the benefit of hindsight, Plaintiff nitpicks the responses to her complaints. But "[w]hether a recipient should have conducted a better or more thorough investigation is not the proper focus." *Doe v. Grandville Pub. Sch. Dist.*, 2019 WL 3050671, at *4 (W.D. MI 2019). Rather, the focus is whether the District's response was so "clearly unreasonable," it showed an "obvious" and deliberate indifference to racial abuse. *Davis*, 526 U.S. at 648. Here, Defendants did not simply use the same techniques they knew would not work. The opposite is true, they tried new and varied strategies to address the harassment. *Vance*, 231 F.3d at 261. In this case it is undisputed: No evidence was overlooked. All identified witnesses were interviewed. All offending students were suspended. As more complaints came in, the District increased the number of days for suspensions school wide for harassment. The Board issued a resolution publicly denouncing racism and harassment.  Plaintiff was provided multiple accommodations to deal with her complaints, including counseling, no contact orders with offending students, and adult monitors to follow Plaintiff in the halls. The Superintendent started a student advisory committee and invited Plaintiff to participate to improve the school environment. The District instituted new staff and student diversity, equity, and inclusion training. This is not a case where the District "both knew and consciously disregarded the known risk to the victim" *Kollaritsch,* 944 F.3d at 621,

48

or "did not investigate at all or stopped investigating for months", which is when deliberate indifference is found. *Doe v. Plymouth-Canton Cmty. Sch.*, 2022 WL 1913074, at *11. To the contrary, it is hard to imagine a school doing more in response to Plaintiff's *particular* complaints. *Stiles*, 819 F.3d at 850–51. If the District's response in this case qualifies as "clearly unreasonable," schools in this Circuit will get a clear message that their only option for student discipline is "to expel first and to ask questions later," which is inconsistent with *Davis*, would violate Michigan's law on Restorative Practices, and have a negative impact on accused students beyond this case.

## II.   PLAINTIFF HAS NOT ESTABLISHED ANY CONSTITUTIONAL VIOLATIONS.

### 1.   Plaintiffs' Equal Protection Claim Fails Because Defendants Were Not Deliberately Indifferent.

The Sixth Circuit explained in *McCoy v. Bd. of Educ., Columbus City Sch.*, that a § 1983 claim should be dismissed if a plaintiff cannot demonstrate "deliberate indifference" under Title VI. 515 Fed. Appx. 387, 392 (6th Cir. 2013), citing *Henderson v. Walled Lake Consol. Schools*, 469 F.3d 479, 492 (6th Cir. 2006). For the reasons stated above, Plaintiff cannot show deliberate indifference so her § 1983 claim should be dismissed.

### 2.   Plaintiff's Substantive Due Process Claim Fails As A Matter Of Law.

It is well-established that "[t]he Substantive Due Process Clause protects individuals from abuses of *governmental* power. The Constitution does not impose a duty on the school to protect students from harm inflicted by private actors such as their

49

classmates." *Marcum ex rel. C.V. v. Bd. of Educ. of Bloom-Carroll Loc. Sch. Dist.*, 727 F. Supp.

2d 657, 673 (S.D. Ohio 2010); *Soper v. Hoben*, 195 F.3d 845, 853 (6th Cir. 1999); *Webb*,

828 F.2d at 1158.

This is true even if the school employee has knowledge of the risk of harm to

the student, *Vidovic v. Mentor City Sch. Dist.*, 921 F. Supp. 2d 775, 791 (N.D. Ohio 2013)

(holding no constitutional duty to intervene to protect student "even with knowledge

that a risk of harm may exist without state intervention"; collecting cases), or even

"knowledge of a student's vulnerability". *Stiles*, 819 F.3d at 854. Thus, there is no

*constitutional* duty for the individual Defendants to protect Plaintiff, or any students,

from harm caused by another student.

*Soper* illustrates this. In *Soper*, a mentally disabled special education student was

harassed, molested, and raped by three of her classmates at school and on the bus. The

student's mother stated that she had previously warned school employees about the

potential danger to her daughter. The Sixth Circuit rejected the notion that the school

or its employees were liable because the Court determined that no special relationship

was created between the plaintiff and the school, the teacher, or the administrators,

even though plaintiff was mentally impaired and at school, and under the teacher's

control when the special needs student was raped. *Soper*, 195 F.3d at 853. As Judge

Cohn put it, "'although parents should be able to expect that their children will be kept

reasonably safe when under the school's supervision ... the school has no constitutional

duty to protect or rescue [students] from harm."' *McCarrick v. Lapeer Cmty. Sch.*, 2013

50

WL 4531261, at *7 (E.D. Mich. 2013, J. Cohn).

Here, there is no constitutional duty for the District to protect Plaintiff from the actions of her peers, even if the District is aware of the risk of harm. Thus, no substantive due process violation occurred as a matter of law.

### 3. Gilbertson And Wood Are Entitled To Qualified Immunity.

Even if it is arguable that Plaintiff's constitutional rights were violated, the claims should still be dismissed because the individual defendants are entitled to qualified immunity. The doctrine of qualified immunity is a defense to § 1983 claims. *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010). "Qualified immunity shields a government official from money damages (and litigation) unless the official's conduct violated a 'clearly established' legal rule." *Beck v. Hamblen Cnty., Tennessee*, 969 F.3d 592, 599 (6th Cir. 2020). The doctrine is designed to protect "all but the plainly incompetent who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). These questions can be answered by the court as a matter of law. *See Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996).

There are two general steps to a qualified immunity analysis. A court must determine whether "the facts alleged show the officer's conduct violated a constitutional right" and whether that right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201-02, (2001). "Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Binay*, 601 F.3d at 647.

The clearly established standard demands that the legal principle "**clearly prohibit the officer's conduct in the particular circumstances before him**...." *District of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018) (emphasis added); *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015). The Sixth Circuit summarized the "clearly established" requirement in *Stevens-Rucker v. City of Columbus*: "plaintiff must show that the right was clearly established in a 'particularized sense,' such that a reasonable officer **confronted with the same situation**" would know that their conduct would violate the constitutional right at issue. 739 F. App'x 834, 839 (6th Cir. 2018) (emphasis added).

In this case, it is not clearly established that the individual Defendants should have done more in response than they did under the circumstances of this case. In light of *Stiles v. Grainger Cnty., Tenn.,* 819 F.3d 834 (6th Cir. 2016) and *Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612 (6th Cir. 2012), similar cases where the Sixth Circuit found no liability, it cannot be credibly argued that it is "clearly established" that Principal Wood and Superintendent Gilbertson violated the constitution. Defendants are unaware of any cases requiring individual Defendants to take further action than they did to investigate Plaintiff's complaints or take additional action against the accused student. Therefore, Plaintiff failed to establish that Defendants are not entitled to qualified immunity.

## III.  PLAINTIFF'S *MONELL* CLAIM AGAINST THE DISTRICT SHOULD BE DISMISSED.

To determine whether the District can be held liable, courts look to (1) whether

the plaintiff has asserted that he has been deprived of a constitutional right; and (2) whether the municipal educational entity is responsible for that violation. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505–06 (6th Cir.1996). As for the second element, municipal entities, such as school districts, cannot be held vicariously liable for the constitutional violations committed by their employees. *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Therefore, school districts cannot be held liable for the conduct of their administrators. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 738 (1989).

Here, Plaintiff cannot establish the first element of a *Monell* claim, so this claim against the District should be dismissed. As stated above, Plaintiff has not established a constitutional violation. Because no constitutional violation has been shown, Plaintiffs' *Monell* claim cannot survive as a matter of law. "[When] no constitutional violation occurred, there can be no *Monell* claim against the [Township], regardless of its policies." *Farinacci v. City of Garfield Hts.*, 2010 WL 1268068, at *5 (N.D. Ohio 2010), aff'd, 461 Fed.Appx. 447 (6th Cir. 2012). *See also McCoy*, 515 Fed.Appx. at 393, where the Sixth Circuit also held that the absence of deliberate indifference pursuant to a Title IX claim is fatal to a companion *Monell* claim made or under section 1983. For the reasons stated above, Defendants were not deliberately indifferent to Plaintiff's complaints. Thus, Plaintiff's *Monell* claim should be dismissed.

Even if it was arguable that a constitutional violation occurred, there is still no *Monell* liability under a policy theory of liability because Plaintiff has not identified a specific unconstitutional policy. "Mere conclusory allegations are not enough. The

pleadings must set forth the specific policy or custom allegedly adopted by the government." *Wright v. Louisville Metro Gov't*, No. 3:21-CV-308-BJB, 2022 WL 178591, at *1 (W.D. Ky. Jan. 19, 2022), certificate of appealability denied, No. 3:21-CV-308-BJB, 2022 WL 586777 (W.D. Ky. Feb. 25, 2022).

Similarly, Plaintiff's custom claim fails as well. A "custom" is the existence of a "clear and persistent pattern" of a violation of **similar** constitutional rights. *Claiborne*, 103 F.3d at 505. If Plaintiff can establish a custom, she must also prove, "[m]ost importantly, the proper policymaking officials acknowledge[d] and acquiesce[d] in the custom." *Braswell v. Corr. Corp. of Am.*, 419 F. App'x 622, 629–30 (6th Cir. 2011), citing *Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010); *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009). Thus, the School Board itself—as the sole school policymaker under Michigan law—must be on notice of deficiencies and omissions in their programming and allow it to continue. *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011). But Plaintiff has not established that the Board of Education acquiesced in unconstitutional conduct. To the contrary, once the Board was alerted of Plaintiff's allegations, the Board immediately issued a resolution denouncing race harassment. (Ex. 35).

Therefore, the *Monell* claim should be dismissed.

## IV.    PLAINTIFFS' ELCRA CLAIMS FAILS.

The Elliott Larsen Civil Rights Act does not specifically prohibit, or even address, harassment based on race.  *See Mayville v Ford Motor Co*, 2006 Mich App LEXIS 3226. Even if Elliott Larsen did, *Doe by next friend Kolokithas v. Alpena Pub. Sch. Dist.*, __

54

N.W.2d __, 2022 WL 17868146, at *6 (Mich. Ct. App. Dec. 22, 2022), compels the conclusion that Plaintiff's claim should be dismissed. In *Kolokithas*, the Michigan Court of Appeals recently found that under the ELCRA, "[a] school avoids vicarious liability for [discrimination] claims if it investigates and takes prompt and appropriate remedial action upon learning of the student's behavior." In *Kolokithas*, the Court of Appeals affirmed the dismissal of a student's student – on – student sex harassment claim against the school district because the school district promptly investigated the complaints of harassment.

As discussed above, the Defendants promptly and appropriately responded to all reports of racial harassment or bullying. Plaintiffs cannot dispute that each report was promptly investigated. Where the report was substantiated, appropriate discipline was issued and the Defendants escalated the discipline over time. This is similar to the school district's response over multiple school years in *Doe* where the district suspended the offending student, escalated the discipline, and took other supportive measures. *Doe*, 2022 WL 17868146, at *1-2. Defendants here also went further than required by *Doe* by adding training for both students and staff in response to Plaintiff's claims during and after the 2021-22 school year. Thus, there is no genuine issue of material fact that Defendants investigated promptly and issued appropriate discipline and Plaintiffs' ELCRA claim therefore fails.

## CONCLUSION

For the above stated reasons, Defendants request that this Court grant their

Motion for Summary Judgment and dismiss Plaintiffs' lawsuit with prejudice.

/s/KENNETH B. CHAPIE
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendants

DATED: April 18, 2023

## CERTIFICATE OF ELECTRONIC SERVICE

KENNETH B. CHAPIE states that on April 18, 2023, he did serve a copy of

**Defendants' Motion for Summary Judgment** via the United States District Court

electronic transmission.

/s/KENNETH B. CHAPIE
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendants
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7048
kchapie@gmhlaw.com
P66148

56