UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

APRIL MALICK, ROB MALICK, and C.M.,
a minor, through her Next Friends April Malick
and Rob Malick,

                    Plaintiffs,                              Case Number 22-11126

v.                                                  Honorable David M. Lawson

CROSWELL-LEXINGTON DISTRICT
SCHOOLS, CROSWELL-LEXINGTON
BOARD OF EDUCATION, DAN
GILBERTSON, and KYLE WOOD,

                    Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

April and Rob Malick's daughter, C.M., has suffered bullying and harassment at school that no student should have to endure, all because of her race. The plaintiffs have brought this action against the school district, its school board, and some of its administrators for unlawful discrimination under Title VI of the 1964 Civil Rights Act and the Fourteenth Amendment seeking damages and other relief. The record shows, and the plaintiffs acknowledge, that school officials responded to the several incidents of harassment with discipline against the offending students and school employees, and with progressive punishment over time. The plaintiffs contend, however, that the defendants' response was inadequate. The defendants have shown that, although the school district — and likely the community where it operates — has a problem with racism, the plaintiffs have not established a record that creates fact issues on all the elements of their claims. Although the response by the school district and its officials to the racist conduct of some of its students and employees could have been more robust, the undisputed evidence does not establish deliberate indifference on their part. Because a showing of deliberate indifference is a necessary

element to all the plaintiff's pleaded claims, the defendants' motion for summary judgment will be granted.

## I. Facts as Established by the Record

Plaintiff C.M. is an African American female.  In 2008, when she was thirteen months old, she was adopted by plaintiffs April and Rob Malick.  The plaintiffs live with their daughter in Sanilac County, Michigan.  Records of the U.S. Census Bureau show that in 2022, the population of Sanilac County was 96% white and 0.7% black.  C.M. attended school in the Croswell-Lexington School District from 2018 through 2021.  During that time frame, there were between one and three black students enrolled in the district's high school out of more than 700 students. The plaintiffs allege that C.M. relentlessly was bullied and harassed by numerous fellow students while attending the defendants' middle school and high school to the point that she became depressed and eventually had to be home schooled.  She later enrolled in a different school district.

C.M. attended sixth grade at the district's middle school from September 2018 through June 2019.  She attended seventh grade classes from September 2019 through March 2020, when the school switched to online attendance due to the coronavirus pandemic.  She was home schooled by her parents for the entire eighth grade school year.  From August 2021 through November 2021, C.M. attended ninth grade classes in person at the district's high school.  In January 2022, the plaintiffs decided to withdraw C.M. from the high school and enroll her in the Port Huron school district, because she did not feel safe attending school and had suffered severe mental stress and a nervous breakdown, for which she was prescribed medication including Prozac.  C.M. had a 2.6 GPA when she left the Croswell-Lexington school district.  After she changed districts, her wellbeing and grades improved significantly.

A. Generalized Evidence of Racism

The plaintiffs point to testimony by C.M. and her parents, and by district teachers and staff, as well as affidavit testimony by students, which they say shows that there was a widespread culture of racism within the Croswell-Lexington schools.  This testimony for the most part is unrelated to any of the specific incidents of racism that C.M. experienced, discussed further below.  The plaintiffs say that C.M. was aware of and affected by the racist culture and witnessed or experienced numerous similar incidents on a daily basis, but they concede that, except for the incidents involving C.M. directly, they made no reports to school officials identifying particular students who made racist or harassing comments.

C.M. testified that on an unspecified date during seventh grade (2019-20 school year), a classmate, D.F., made racist comments about "the Holocaust" and "black people" during conversations with other students while C.M. was present and within earshot of teachers.  C.M. dep., ECF No. 29-6, PageID.328.  The statements were not made directly to C.M., and she did not report the comments to school staff.  *Ibid.*  C.M. did not know if D.F. received any discipline.

On March 9, 2020, C.M. and her parents April and Rob Malick had a meeting with Croswell-Lexington superintendent of schools Dan Gilbertson and middle school assistant principal Ryan Eugster.  Bethany Davis dep., ECF No. 30-2, PageID.520.  During the meeting, C.M. reported that unidentified students "used the N-word" in the school hallways.  However, no students who had done so were identified, C.M. did not report the incidents contemporaneously to teachers or school officials, and the incidents did not occur within earshot of teachers who might have heard the racist epithets being used.  April Malick dep., ECF No. 30-3, PageID.545; *see also* Meeting Notes dated Mar. 9, 2020, ECF No. 30-4, PageID.582.  During the meeting, C.M. also stated that "at that time" she "felt safe attending school."  *Ibid.*

Nonetheless, over the years that C.M. was a student in the district's schools, the ugly specter of racism recurred. Plaintiffs' counsel documented 67 incidents of racial harassment of students from September 2019 through September 2022, some of which involved C.M. and many which did not. *See* Resp. to Mot for Summ. J., Ex. AA., ECF No. 50, PageID.3074-80. Eighteen incidents, for instance, occurred in the district's middle school during the time that C.M. attended high school. The table identifies 47 distinct harassers by initials. Thirteen of them were repeat offenders, some of them with multiple reports on the same day. Forty-two of the 67 incidents did not involve C.M.

### B. Specific Incidents of Racial Harassment of C.M.

#### 1. 2018-2019 School Year (Sixth Grade)

During the 2018-2019 school year, C.M. was enrolled in the sixth grade at the Croswell-Lexington middle school. Sometime in August or September, another student, W.H., called C.M. a "penguin" — a pejorative reference to the mixed racial composition of her family — used the "N-word," and made racist jokes during conversations with C.M. C.M. dep., ECF No. 29-6, PageID.326. C.M. reported the incident to her parents, who reported it to her teacher. School officials contacted W.H.'s parents, and he was forced to write an apology letter to C.M. The school did not inform C.M. if any other discipline was imposed. C.M. testified that she did not experience any other incidents of racial harassment for the rest of the school year. *Ibid.*

#### 2. 2019-2020 School Year (Seventh Grade)

During the 2019-2020 school year, the plaintiff was enrolled in the seventh grade at the Croswell-Lexington middle school. The plaintiff reported three incidents of racial harassment that occurred during the school year.

The first incident occurred over several days leading up to the start of the school term. During the weekend before classes resumed, C.M. and S.D. were having a conversation on

SnapChat, and C.M. testified that she called S.D. a "redneck," and called her a "little bitch" or "little slut," and told S.D. to "go fuck her dad."  C.M. dep., ECF No. 29-6, PageID.327.  C.M. did not know at the time that S.D.'s father recently had died.  S.D. responded, "it's on," and said that she was going to fight C.M.  On the second day of classes, September 4, 2019, S.D. approached C.M. in the lunchroom, "pulled her sleeve," pushed C.M. twice, and also pushed one of C.M.'s friends.  The middle school assistant principal, Bethany Davis, broke up the fight and called the parents of both students.   Davis prepared a disciplinary report and notice of suspension memorializing the incident and statements given by C.M. and other student witnesses.  *See* Notice of Suspension dated Sept. 4, 2019, ECF No. 29-8, PageID.400-417.  The report also included email correspondence exchanged between school officials and C.M.'s parents reporting the incident and the Malicks' complaints about whether the action taken was appropriate.  *Id.* at 414-17.  S.D. was given a one-day out-of-school suspension, and both S.D. and C.M. signed "behavior contracts" under which they agreed to block each other on social media and avoid personal contact.  *Id.* at 410-11.  C.M. was told by the school principal, Ryan Eugster, that she was not to approach S.D. if she saw S.D. in the hallway, and S.D. was told not to approach C.M.  The principal told C.M. that he would patrol the hallways to ensure that S.D. and C.M. did not approach or interact with each other so they would not fight again.  C.M. dep. at PageID.327-28.  C.M. said that she did not recall if S.D. ever made any racist comments to her.  *Id.* at 328.  It is undisputed that school officials did not receive any other reports of racial harassment from C.M. during the remainder of the fall semester.

The second incident was reported by plaintiff Rob Malick on January 22, 2020.  Malick emailed assistant principal Ryan Eugster and relayed C.M.'s report that a female student, G.D., had said that G.D. planned to "rip [C.M.'s] so called wig off" and "have someone record it."

Emails dated Jan. 22-24, 2020, ECF No. 29-9, PageID.419-424.  Eugster discussed the incident

with C.M. and G.D. and wrote back to Malick, reporting as follows:

> After digging deeper, it appears that this is straight-up 7th grade girl drama and
> rumor-mill stuff.  C.M. said that she is getting the information second-hand from
> another girl, who is also participating in the rumor creation/discussion.  All parties
> have been warned that further discussion on this topic will lead to consequences.  I
> am also turning it over to the school social worker, Dana Brown.

Email dated Jan. 24, 2020, PageID.420.  No further disciplinary action was taken against G.D.

Malick responded, stating: "Excellent thank you so much.  Doesn't surprise me in the least.  Have

a great weekend."  *Ibid.*

The third incident occurred on March 5, 2020.  C.M. was in Ms. Dunmore's careers class,

and the students were watching an online video about how to interview for a job.  C.M. dep. at

PageID.328; *see also* Notice of Suspension, ECF No. 30-1, PageID.464-481.  The video showed

two interviewers who were black.  D.S. turned to C.M. and asked, "Are those your parents," and

then said "n*****s can't get jobs."  C.M. reported the incident to Ms. Dunmore and asked if she

could go to the office to report the incident to assistant principal Ryan Eugster.  C.M. was given

permission to do so and reported the incident to Eugster.  Eugster investigated the incident and

compiled statements from C.M., the teacher, and other student witnesses.  D.S. received a one-day

out-of-school suspension, was required verbally to apologize to C.M., and had to sign a behavior

contract.  *Id.* at PageID.463-66.

It is undisputed that the school shifted to virtual attendance at the outset of the coronavirus

pandemic crisis in mid-March 2020, and no further incidents of harassment were reported to school

officials for the remainder of the school year.

### 3. 2020-2021 School Year (Eighth Grade — Home School)

On October 6, 2020, plaintiff Rob Malick wrote to Bridgid Van Howe (apparently a school official in an unidentified position), stating that the Malicks would be home schooling C.M. during the 2020-21 school year.  Malick wrote as follows:

> Thank you so much for everything.  She could go back after the semester but I think we're going to sit this one out.  Honestly it wasn't so much about the covid (although it was a factor) as it was about the election.  She absolutely got owned last year in regards to racial bullying and abuse.  There is no way we we're sending her back before Nov 3.  Middle school kids are brutal.  She is not a saint, but didn't have coming what she got.

Email dated Oct. 6, 2020, ECF No. 53-3, PageID.4098.  It is undisputed that neither C.M. nor the Malicks reported to school officials any specific instances of racial harassment of C.M. during the eighth grade school year.

### 4. 2021-2022 School Year (Ninth Grade)

In June 2021, before the school year commenced, C.M. saw a photograph on social media of a student, A.G., who wore a Confederate flag as a cape to school.  C.M. dep., ECF No. 29-6, PageID.329-30.  C.M. testified that when she was in middle school, A.G. had "said the N-word" to C.M. and "said some racial things and some not very nice things" to her.  *Id.* at PageID.330.  C.M. said she could not recall if she had reported the middle school incident with A.G. to any school officials.  *Ibid.*  However, C.M. told her parents about the social media photo that she saw, and on June 11, 2021, Rob Malick emailed superintendent Dan Gilbertson and informed him of the incident.  Email dated June 11, 2021, ECF No. 30-7, PageID.641.  Croswell-Lexington assistant principal Bethany Davis testified that at the time when the flag cape incident occurred, she was notified about A.G. wearing the flag cape and immediately spoke to A.G., explained why wearing the flag was inappropriate, and told her to remove it.  A.G. complied.  However, no discipline was imposed for the incident.  Bethany Davis dep., ECF No. 30-2, PageID.528.  Rob

Malick confirmed that the incident occurred on the last day of the 2020-21 school year, when C.M. was not in attendance, that C.M. had not witnessed the incident in person, and that superintendent Gilbertson later reported that A.G. had been counseled by Davis.  Rob Malick dep., ECF No. 29-7, PageID.321.

Shortly before the start of the 2021-22 school year, high school principal Kyle Wood met with April Malick, and she reported to him her concerns that C.M. would suffer similar incidents of racism like those that she had suffered while attending middle school.  Kyle Wood dep., ECF No. 30-9, PageID.649.  Malick said to Wood that the family wanted a "fresh start" for C.M. in high school.  *Id.* at PageID.650.  Wood told Malick that if any such incidents occurred during the upcoming school year, C.M. should report them to a teacher, counselor, or school administrators. *Id.* at 649-50.

The Malicks also met with school counselor Melody Mills in August 2021, before the school year began, and reported to Mills that C.M. had suffered numerous incidents of racial harassment during middle school.  Melody Mills dep., ECF No. 31, PageID.723-24.  Mills changed C.M.'s class schedule so that she would not be in classes with some of the students whom the Malicks had identified as having harassed C.M. previously.  However, she was not able to separate C.M. and A.G. because they were in a class that only was scheduled for a single class period each day, and the curriculum required C.M. to take that class.  *Id.* at 724.

Sometime in September 2021, after the school year commenced, April Malick spoke to superintendent Gilbertson at a football game and told him that C.M. "was doing fine and enjoying her time at the high school," and Gilbertson replied, "I'm glad she's doing well."  April Malick dep., ECF No. 30-3, PageID.547.

On October 4, 2021, Rob Malick emailed principal Wood and assistant principal Lisa Burns stating that C.M. "[h]ad a huge series of incidents today and the past week or so."  Email dated Oct. 4, 2021, ECF No. 31-1, PageID.746.  Malick included screenshots of handwritten notes he had taken naming nine students who were involved in the incidents.  *Id.* at 746-48.  On October 5, 2021, superintendent Gilbertson, principal Wood, and assistant principal Burns met with the Malicks to discuss the October 4th report.  Gilbertson dep., ECF No. 30-9, PageID.671.  The reported incidents were investigated, and statements were taken from the students involved.  It appears to be undisputed that all of the alleged incidents occurred during C.M.'s fourth period algebra class and transpired on either October 1, 2021 or October 4, 2021.  Student H.R. said to C.M. that he would "snatch her weave" and "burn it."  Notes dated Oct. 4, 2021, ECF No. 31-1, PageID.747.  Student A.M. also said that he wanted to "pull her weave out."  *Ibid.*  Student A.S. said to C.M. that she "looks like shit," used the N-word, and told C.M. to "go back to the plantation and pick cotton."  *Id.* at 748.  Student J.S. — reportedly the ringleader of the fourth-hour harassers — said that he wanted to "snatch her weave," and also "raised his fist" and said "black lives matter."  *Ibid.*  Student D.P. echoed the "weave snatching" commentary evidently without making any physical gestures.

Student H.R. was disciplined with a one-day out-of-school suspension, and his parents were notified.  Report dated Oct. 13, 2021, ECF No. 31-2, PageID.756.  Students A.M., D.P., and J.S.. received the same penalty of one-day out-of-school suspension, and their parents also were notified.  Reports dated Oct. 4, 2021, Oct. 9, 2021, Oct. 14, 2021, PageID.760, 762, 768.  Student A.S., who made the "cotton picking" comment, was disciplined with one day in-school suspension and one day out-of-school suspension.  Report dated Oct. 4, 2021, PageID.775.

On October 7, 2021, Croswell Police Lieutenant Brenda Krumenaker reported that she had investigated a report of a threat involving Croswell-Lexington students. Krumenaker wrote that a parent, Andrea Dunbar, had informed April Malick that Dunbar's son had said he was concerned that "something was supposed to happen" at a school assembly, and that the student was afraid that C.M. might be the target of a potential shooting incident. Police Report dated Oct. 7, 2021, ECF No. 31-5, PageID.793. Ms. Dunbar stated that she would not allow her child to attend school and told Ms. Malick that she should not allow C.M. to attend. *Ibid.* Krumenaker said that Sergeant Kravitzky from the Sanilac County Sheriff's Department had spoken to Ms. Dunbar as well as Principal Wood and Assistant Principal Burns, and that the school officials had told him that the student who reportedly was the suspect had been checked at school and no gun was found. *Ibid.* The school officials requested that a police officer be stationed at the school on October 8, 2021, and Chief Krumenaker said that an officer would be present then. *Id.* at 793-94. The police investigated further, interviewed Ms. Malick, school officials, and other staff, and also made contact with the suspected student. It was reported that the student had been behaving erratically, and the student was observed to have "glassy eyes, slurred speech, and fidgety behavior." *Ibid.* The student and her mother eventually agreed to be transported by ambulance to Port Huron hospital for mental health evaluation. *Id.* at 794. The report concluded that there was no weapon present and that reports of a gun being present at school had been exaggerated by word of mouth as rumors about the incident multiplied through the student body. *Ibid.*

Following the meeting, a procedure was established for C.M. to report any further incidents of harassment to counselor Mills, and Mills attested that she had several discussions with C.M. during October and November 2021. Mills dep., ECF No. 31, PageID.725.

C.M. reported to her parents that another student had given her a handwritten noted dated October 14, 2021, in which it was written that during a sixth period class (which C.M. did not attend), several students had discussed that "her hair is a weave" and that they wanted to "snatch her weave." Rob Malick emailed superintendent Gilbertson a screenshot of the handwritten note during a meeting between the Malicks and school officials that occurred on October 26, 2021. Email dated Oct. 26, 2021, ECF No. 31-7, PageID.803-806. Plaintiff admitted that she only learned about the comments through the anonymous note that was passed to her from another unidentified student. C.M. dep., ECF No. 29-6, PageID.333.

Also on October 27, 2021, C.M. reported to counselor Mills that she had overheard student A.G. using the N-word in class. Report dated Oct. 27, 2021, ECF No. 31-8, PageID.810. C.M. testified that she confronted A.G. and told her to stop saying the N-word. C.M. dep., ECF No. 29-6, PageID.334. Later, C.M. heard from another student that A.G. had said that "[t]he N's are going to get it," and that C.M. should "watch out." *Ibid.* C.M. confronted A.G. a second time about wanting to fight with her. *Ibid.* Principal Wood met with C.M., Rob Malick, and assistant principal Burns, and he took statements from several student witnesses. *Id.* at PageID.809-832. A.G. admitted that she had said she wanted to fight C.M. but said she only used the N-word outside of school and around friends. *Id.* at 826. Wood suspended A.G. for three days — one day in-school and two days out-of-school. *Id.* at 833. During the October 27th meeting, Mr. Malick stated that the Malicks wanted C.M. to be moved to another class, but they were told that the algebra class was required by C.M.'s curriculum and only was offered during one period due to the number of students who need to take it; however, counselor Mills and Wood suggested that they could check to see whether there might be an option for C.M. to take an online class section to fulfill the math requirement. *Id.* at PageID.810. After A.G. returned from suspension, the

teacher moved her seat "all the way across the room" so that C.M. and A.G. no longer sat near each other in class.  C.M. dep. at PageID.335.  C.M. said that after that A.G. did not make any more racist comments to her.  *Ibid.*

On October 29, 2021, C.M. went to school dressed in costume as a blue M&M candy. Another student, W.H., said to her, "M&M's are not supposed to be black."  C.M. dep. at PageID.335.  Wood investigated the incident and imposed a one-day out-of-school suspension as discipline.  Report dated Oct. 29, 2021, ECF No. 32, PageID.867.

On November 8, 2021, Rob Malick emailed Gilbertson, Wood, and Burns and stated that a school employee, who wanted to remain anonymous, reported that a school staffer assigned as a "monitor" to chaperone C.M. had made "absolutely horrible" remarks about C.M.  Wood investigated and identified the staffer as Lorie Swoffer, who had said that C.M. was "playing the race card," and "acted like she was from the hood in Detroit."  Notes dated Nov. 10, 2021, ECF No. 35, PageID.912.  Swoffer was terminated on November 15, 2021.  Letter dated Nov. 15, 2021, ECF No. 35, PageID.914.

On November 19, 2021, Rob Malick emailed Gilbertson, Wood, and Burns and reported that a student, S.S., had said to C.M., "I hate all you black bitches."  Email dated Nov. 29, 2021, ECF No. 36, PageID.930.  Wood investigated the incident, contacted S.S.'s parents, and eventually imposed a five-day out-of-school suspension as discipline.  Report dated Nov. 23, 2021, ECF No. 36, PageID.932.

On November 26, 2021, Rob Malick emailed Gilbertson, Wood, and Burns and reported that a sixth period substitute teacher had asked the class where student S.S. was.  C.M. replied that he had been suspended for "being bad and a racist."  Email dated Nov. 26, 2021, ECF No. 36-1, PageID.966.  The substitute teacher said, "that doesn't mean he's a bad person," and then related

an anecdote about how two decades prior a black student had transferred into the district and began bullying other students, and her son, who was then a student, "took care of the situation."  Wood investigated the incident, interviewed the substitute teacher, Karen Kovach, and issued a written reprimand which was placed in her employment file.  *See* Letter dated Dec. 2, 2021, ECF No. 36-1, PageID.985.  The defendants assert — and it appears to be undisputed — that Ms. Kovach was not employed thereafter as a substitute teacher.

Around December 1, 2021, principal Wood received a report that students were engaged in an out-of-school, after hours chat room discussion related to a sixth period civics class, and that one student, T.W. had "used the N-word" and written "Obama is a stupid n****r."  *See* Email dated Dec. 1, 2021, ECF No. 36-10, PageID.1089; Kyle Wood dep., ECF No. 30-9, PageID.683; Kyle Woods decl., ECF No. 36-12, PageID.1103.  The student was disciplined with a five-day out-of-school suspension and his parents were contacted.  *Ibid.*  It appears to be undisputed that C.M. was not a participant in the chat group.

On December 7, 2021, Rob Malick emailed Gilbertson, Wood, and Burns and included a photograph that C.M. said that a fellow student, B.R., had posted to Snapchat, which showed B.R. wearing a cloth head covering referred to as a "silky" or "do rag" on his head.  Email dated Dec. 7, 2021, ECF No. 36-2, PageID.987.  C.M. interpreted the photograph as "mocking African American culture."  *Id.* at 991.  Wood investigated the report, contacted B.R.'s parents, and imposed a two day out-of-school suspension as discipline.  Report dated Dec. 8, 2021, ECF No. 36-2, PageID.992.

Finally, around December 8, 2021, Malick reported to school officials that a teacher, Scott Coats, had allowed students to engage in racist conversations during a social studies class. However, Malick admitted that C.M. was not in Coats's class and was not present during the

incidents.  Rob Malick dep., ECF No. 29-7, PageID.388.  The district's civil rights compliance officer testified that she and principal Wood participated in a disciplinary meeting with Wood and Coats, a written reprimand was put in Coats's file, and Coats was placed on an "individualized development plan" ("IDP") for one year.  Donna Barrier dep., ECF No. 36-5, PageID.1065.  The reprimand stated that Coats was being disciplined for allowing students to engage in "[i]nappropriate name-calling of [the] president and vice president," for "separating a foreign exchange student from the rest of the class," and for "[i]nappropriate cultural jokes."  Letter dated Dec. 8, 2021, ECF No. 30-6, PageID.939

It appears to be undisputed that no further specific incidents of racial harassment were reported by the plaintiffs from December 2021 through February 2022.  However, the plaintiffs say that C.M. suffered depression and told her parents in January 2022 that she no longer could attend the high school.  They say that subsequently she was diagnosed with post-traumatic stress disorder (PTSD).  It is undisputed that the Malicks informed school officials that C.M. would not attend school in person after February 11, 2022 and would complete the school year through virtual attendance.  She subsequently transferred to the Port Huron school district.

### C. The District's Response to Racial Issues

The defendants contend that they instituted other supportive and corrective measures starting in November 2021 including the following: (1) the school assigned adult monitors to walk with C.M. in the hallways and to be present in her classes to discourage further harassment; (2) superintendent Gilbertson instituted a "student advisory group," which was a group of 30 students who met with him periodically starting on November 2, 2021, to discuss "culture" and other issues at the school, *see* Meeting Minutes dated Nov. 2, 2021, ECF No. 32-2; (3) Gilbertson sent a letter to all Croswell-Lexington staff on November 12, 2021, noting that several minority students had reported recent incidents of racial harassment, and reminding staff of their obligation to report any

such incidents to school administrators, and that discipline could result from failures to report, *see* Letter dated Nov. 12, 2021, ECF No. 33, PageID.902; (4) on November 15, 2021, the Croswell-Lexington School Board approved a resolution stating that the district "unequivocally stands against racism and all forms of unlawful discrimination," and that "any instance of unlawful discriminatory conduct . . . shall be dealt with in the appropriate manner," and the board also reaffirmed its previously adopted Nondiscrimination Policy, *see* Meeting Minutes dated Nov. 18, 2021, ECF No. 34, PageID.906-07; and (5) on November 18, 2021, Gilbertson sent a letter to all parents of Croswell-Lexington students advising them of the recently adopted resolution and stating that "[o]ver the next several weeks and months, we will be presenting proactive measures to address these issues," *see* Email dated Nov. 18, 2021, ECF No. 36-8, PageID.1065. The district also implemented two new training programs for district staff covering "Cultural Competence and Racial Bias" (an 18-minute online program), and "Diversity, Equity and Inclusion Awareness for Employees" (56 minutes), which district staff were required to complete by December 17, 2021. *See* Email dated Dec. 9, 2021, ECF No. 36-6, PageID.1061.

Principal Wood testified that the high school also implemented a program known as "Growing Leaders" or "Habitudes," which was a "Social-Emotional Learning" presentation in the form of PowerPoint slides that all teachers were required to present to their classes starting in February 2022. Kyle Wood dep., ECF No. 30-9, PageID.654. The district also required its civil rights compliance officers to attend training covering how to respond to student complaints of racial harassment. Donna Barrier dep., ECF No. 36-5, PageID.1044. The district also hired additional social workers to ensure that one social worker would be staffed at every school in the district. *Id.* at PageID.1052.

### D.  Procedural History

The plaintiffs filed their complaint on May 23, 2022.  The complaint pleads claims for (1)

hostile environment racial discrimination under Title VI of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000d (Count I), (2) hostile environment racial discrimination under the State of Michigan's

Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2102 *et seq.*, (3) violations of

the Equal Protection Clause of the Fourteenth Amendment via 42 U.S.C. § 1983 (Count III), and

(4) substantive due process violations (Count IV).  After discovery closed, the defendants filed the

present motion for summary judgment asking for dismissal of all counts.

### II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  When reviewing the motion record, "[t]he court must view the evidence and draw all

reasonable inferences in favor of the non-moving party, and determine 'whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law.'"  *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th

Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  "The court

need consider only the cited materials, but it may consider other materials in the record."  Fed. R.

Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its

motion and identify portions of the record that demonstrate that no material facts are genuinely in

dispute.  *Id.* at 558. (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d

845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on

the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make

- 16 -

an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

### A.  Title VI Claim

"Title VI prohibits any 'program or activity receiving Federal financial assistance' from discriminating against any person 'on the ground of race, color, or national origin.'" *M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 453 (6th Cir. 2021) (quoting 42 U.S.C. § 2000d).  "And it provides a private cause of action for injunctive relief and damages." *Ibid.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001)).

Although the Sixth Circuit has not addressed the precise analytical framework for student-on-student racial harassment cases under Title VI, it has assumed that the cases expounding similar claims for sexual harassment under Title IX would govern.  *See Thompson v. Ohio State Univ.*, 639 F. App'x 333, 342 (6th Cir. 2012).  That is consistent with the Supreme Court's observation that "Title VI of the Civil Rights Act of 1964, . . . is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs," and that "[t]he two statutes operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (citing 42 U.S.C. § 2000d *et seq.*).  "Other circuits have accordingly held that a school can be liable for deliberate indifference to racial harassment under Title VI, noting that Title IX was based on Title VI." *Thompson*, 639 F. App'x at 342 (citing *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 n. 10 (2d Cir. 2012); *Bryant v. Indep. Sch. Dist. No. I-38*, 334 F.3d 928, 934 (10th Cir. 2003)).

The elemental lodestar for these kinds of cases is *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), a Title IX case.  Title VI "proscribes only intentional discrimination." *M.J. ex rel. S.J.*, 1 F.4th at 453.  Drawing the parallel to Title IX cases, to prove that a school district is liable for intentional discrimination under the statute for student-on-student racial harassment, the plaintiffs must prove (among other things) that it was deliberately indifferent to the harassment after it had notice of the harassing conduct.  *Davis*, 526 U.S. at 648-53. According to the Sixth Circuit, to bring a case to trial, a plaintiff must produce evidence of "[1] an incident of actionable [racial] harassment, [2] the school's actual knowledge of it, [3] some further incident of actionable [racial] harassment, [4] that the further actionable harassment would not have happened but for the objective unreasonableness (deliberate indifference) of the school's response, and [5] that the Title [VI] injury is attributable to the post-actual-knowledge further harassment." *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 623-24 (6th Cir. 2019).

In their motion, the defendants attack several of these elements of the plaintiffs' Title VI case.  They contend that there was no actionable harassment because the evidence does not show that the students' conduct was objectively racially offensive, severe, or pervasive in occurrence. They say that vague complaints of generalized harassment not attributed to specific dates and harassers is not actionable, nor is conduct that occurred outside of school hours and through facilities not associated with the school like social media.  The defendants also argue that the plaintiffs have not proved an injury, because damages for emotional distress and pain and suffering, as well as punitive damages, are not available remedies for violations of Spending Clause legislation such as Title VI, and the plaintiffs have not established that they suffered any economic damages, such as expenses for therapy or counseling.  Finally, the defendants maintain

that their responses to the plaintiffs' complaints did not constitute deliberate indifference because their conduct was not "clearly unreasonable."

The record does not support the defendants' first two arguments.  The last one merits discussion.

The plaintiffs have produced evidence of actionable harassment.   The Sixth Circuit has "conservatively describe[d] 'harassment,' without additional qualification, as some type of aggressive and antagonistic behavior that, from the victim's perspective, is uninvited, unwanted, and non-consensual." *Kollaritsch*, 944 F.3d at 620.  "For student-on-student sexual harassment to be actionable under *Davis*'s Title IX private-cause-of-action formulation, it must be (a) severe, (b) pervasive, and (c) objectively offensive." *Ibid.* (citing *Davis*, 526 U.S. at 651).  "'Severe' means something more than just juvenile behavior among students, even behavior that is antagonistic, non-consensual, and crass." *Ibid.*  "The *Davis* Court made an explicit admonishment that 'simple acts of teasing and name-calling' are not enough, 'even where these comments target differences in gender.'" *Ibid.* (quoting *Davis*, 526 U.S. at 651-652 ("It is not enough to show . . . that a student has been 'teased,' or 'called offensive names.'") (cleaned up))).

The conduct in this case went well beyond teasing and name-calling.  It involved the use of vile racial epithets including the N-word, among other racially offensive terms and innuendos, and it included threats of physical assault.  "'Objectively offensive' means behavior that would be offensive to a reasonable person under the circumstances, not merely offensive to the victim, personally or subjectively." *Id.* at 621 (citing *Davis*, 526 U.S. at 651).  Racial epithets coupled with threats to pull hair and "snatch" C.M.'s "weave" are offensive — or ought to be — to members of a civil society, including those who reside within the district — parents, students, and

school administrators alike.  The conduct of the several students here easily qualifies as severe and objectively offensive.

The harassment also was pervasive.  "'Pervasive' means 'systemic' or 'widespread,' but for our purposes, it also means multiple incidents of harassment; one incident of harassment is not enough."  *Ibid.* (quoting *Davis*, 526 U.S. at 652-53).  Here, the harassment persisted throughout the time that C.M. attended middle school and high school in person between 2019 and 2021, the specific incidents reported by the plaintiffs occurred in the context of other incidents of racial abuse that occurred throughout the school with regularity, and the harassment ultimately had such a serious effect on C.M. that it caused her after 2021 to withdraw from public school and be home schooled.  It even included conduct by some teachers.  The testimony about generalized harassment that occurred on a "daily basis," not associated with specific incident reports or particular harassers, may be considered for the purpose of determining the level of severity and pervasiveness, since C.M. and the school administration were aware of the culture of racism at the school, which had an effect on C.M.'s state of mind.

The plaintiffs also have shown that C.M. suffered compensable damages.  It is true that under *Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562 (2022), damages for emotional distress and pain and suffering, as well as punitive damages, are not available remedies for violations of Spending Clause legislation such as Title VI.  But the plaintiffs also have proved that they suffered economic losses distinct from emotional distress or pain and suffering damages, which included buying new textbooks, new school sports gear and uniforms, and additional gas expenses for commuting to a different school district, after C.M. withdrew from the defendants' district.  Moreover, "injury" in the Title IX context, and therefore also under Title VI, "means the deprivation of 'access to the educational opportunities or benefits provided by the school.'"

*Kollaritsch*, 944 F.3d at 622 (quoting *Davis*, 526 U.S. at 650).  Cognizable injury may be demonstrated by evidence of such things as a student's inability to concentrate on her studies, causing her grades to deteriorate; fear of attending school; having to complete her studies at home; or deteriorating grades due to a diagnosed mental condition such as depression.  *Id.* at 622. However, "[e]motional harm standing alone is not a redressable Title IX injury."  *Ibid.* Nonetheless, the evidence in this case easily satisfies the rubric of a "cognizable injury."

The evidence of deliberate indifference is another matter.    It has been observed that "the phrase . . . presents a 'high bar' to imposing Title IX" (and therefore Title VI) liability on a school district.  *See Foster v. Bd. of Regents of Univ. of Michigan*, 982 F.3d 960, 965 (6th Cir. 2020) (quoting *Stiles ex rel. D.S. v. Grainger Cnty.*, 819 F.3d 834, 848 (6th Cir. 2016)).  "By design and effect, the *Davis* Court's Title IX private cause of action against a school for its response to student-on-student sexual harassment is a 'high standard' that applies only 'in certain limited circumstances.'"  *Kollaritsch*, 944 F.3d at 619 (quoting *Davis*, 526 U.S. at 643).  "The school is 'properly held liable in damages only where [it is] deliberately indifferent to [racial] harassment, of which [it] has actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'"  *Ibid.* (quoting *Davis*, 526 U.S. at 650).  "[T]he *Davis* formula clearly has two separate components, comprising separate-but-related torts by separate-and-unrelated tortfeasors: (1) 'actionable harassment' by a student; and (2) a deliberate-indifference intentional tort by the school."  *Id.* at 619-20 (quoting *Davis*, 526 U.S. at 643, 651-52).  "The critical point here is that the *Davis* formulation requires that the school had actual knowledge of some actionable sexual harassment and that the school's deliberate indifference to it resulted in further actionable harassment of the student-victim."  *Id.* at 620.

The plaintiffs have not shown that the school district's and its administrators' responses to the several complained-of instances of harassing conduct by students and teachers directed to C.M. surmounts that "high bar" as it has been erected by Sixth Circuit jurisprudence.  In *Foster*, the court explored the contours of this standard in considerable depth and elucidated the dividing line between actionable inaction and a merely inactive (and inactionable) response of questionable vigor.  On one side was *Davis*, the facts of which are notably extreme.  There, a fifth-grade boy engaged in a months-long operation against a female seatmate that included graphic, vulgar sexual statements and sexual contact that occurred in the classroom in the presence of a teacher.  Despite the student's immediate and continued reporting, the school took "no disciplinary action" and made no effort to separate the harasser from the victim until after three months, when the teacher finally allowed the girl to change seats.  That evidence, said the court, constituted deliberate indifference.  *Foster*, 982 F.3d at 965-66.  By contrast, the conduct in this case arguably was less severe, but, more relevant here, the school's response was remarkably more vigorous than was the defendant's lack of response in *Davis*.

*Foster* further illustrates the point.  In that case, the plaintiff, a woman, complained of persistent unwelcome contact from a male fellow student in a university graduate program sited in a remote city.  The students resided in a hotel.  Foster filed a complaint with the university that a married male student in the program had harassed her through emails, text messages, and social media posts.  The conduct escalated with unwanted visits to her room, expressions of love and affection, and physical touching.  He went so far as to walk in to her shower when she was naked and tried to kiss her.  When Foster attempted to break off contact, he "unleashed tons of hurtful texts."  984 F.3d at 962-63.  The university interviewed the harasser, whose narrative portrayed a less aggressive, consensual version of their relationship.  The university responded by issuing a

no-contact order, housing the harasser in a different hotel, and barring him from the dining hall when Foster was present.  It also prohibited him from attending the commencement ceremony at the home campus, and later banned him from campus for three years.  And it allowed Foster accommodations to complete her assignments before graduation and engaged in measures to protect her safety.  *Id.* at 963-65.

After the district court dismissed Foster's Title IX claim, the court of appeals held as a matter of law that the university's response to Foster's complaints did not amount to deliberate indifference.  It found significance in the fact that the university responded to each of Foster's complaints, accommodated her own educational needs, and took care to separate her from the harasser during the program, all "measures [that] went beyond what a university is required to do." *Id.* at 967.  The court rejected the idea that "whenever harassment continues after a school receives notice, a reasonable jury can find that the school remained deliberately indifferent." *Id.* at 968.  It explained that "[t]he deliberate indifference standard makes schools liable when they refuse to take action to bring the recipient into compliance, not when they take action that ultimately fails to purge their schools of actionable peer harassment." *Ibid.* (cleaned up).

In this case, the plaintiffs acknowledge that the school district did not ignore their complaints and that there was at least some response.  They insist, however, that the response was anemic and that the district should have done more to curb the culture of racism and the student harassment of C.M.  The *Foster* court provides guidance on that score as well, discussing cases that, it believed, help define the contours of the deliberate indifference standard.

> Compare these circumstances to a case with far less proactive conduct by the school and in which the school nonetheless prevailed. *Stiles ex rel. D.S. v. Grainger County*, 819 F.3d 834, 849 (6th Cir. 2016), involved a school administration that responded to a victim's allegations of continued peer-on-peer harassment, filed over the course of 18 months, with one verbal warning after another. *See* 819 F.3d at 849.  Even so, because the school went beyond "merely talking to the offender[]"

and took some proactive steps to protect the victim from further harassment, we concluded it could not be found liable for failing to "eliminate [his] peer harassment" altogether. *Id.* at 850-51. . . .

Now compare these circumstances to cases in which the schools lost. In *Vance v. Spencer County Public School District*, harassers "touched [a middle school girl] inappropriately" in "virtually every class" for over a year. 231 F.3d 253, 257 (6th Cir. 2000). Despite repeated complaints by the victim and her mother to school officials, they responded only with a string of verbal warnings. "[T]he more [the victim and her mother] complained," the more the harassment "seemed to increase." *Id.* In that context, we found the school's pattern of non-responses deliberately indifferent. *Id.* at 262-63. Likewise, in *Patterson v. Hudson Area Schools*, the victim suffered years of "persistent harassment" that included "daily" bullying, physical assault, and sexual assault. 551 F.3d 438, 439, 442, 448 (6th Cir. 2009). We found a cognizable claim of deliberate indifference because the school's "only response" to the victim and his mother's pleas for help was to "employ the same type of verbal reprimands" that had already come up short. *Id.* at 449. Reading the facts in these cases is all it takes to appreciate the significant difference between those cases and this one.

*Id.* at 967-68. The court told district courts to focus on the school district's conduct (or lack of it), not the results. "We ask not whether the school's efforts were ineffective but whether they amounted to an official decision not to remedy the violation." *Id.* at 968 (cleaned up). Emphasizing the point, the court declared, "To the extent *Patterson* suggests that an ineffective response necessarily generates a jury issue on deliberate indifference, that is wrong." *Ibid.* (citation omitted).

When viewed against this backdrop, the evidence in this case does not create a triable issue of deliberate indifference by the defendants to the plaintiffs' complaints of racial harassment. The plaintiffs' presentation somewhat obfuscates both the temporal span of the harassment in this case and the escalation of the response by school officials. They point to testimony by C.M. and other students to the effect that racial harassment was "continual" and "daily," but except for the specific instances discussed above, they have presented no evidence that they reported any such "daily" incidents to the responsible school officials, or that any students other than those noted were identified by the plaintiffs so as to allow investigation or discipline by officials. The cases require

that a responsible official had "actual knowledge" of harassing conduct "that prompted or should have prompted a response." *Kollaritsch*, 944 F.3d at 621 (quoting *Davis*, 526 U.S. at 650).  And although the school district personnel ought to be aware of racial harassment generally within the school, the deliberate indifference formulation individualizes the harassment as being directed to the same victim; a Title VI claimant "'cannot . . . premise the [further harassment] element of her . . . claim on conduct [by the perpetrator] directed at third parties.'"  *Id.* at 621-22 (quoting *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012)).  In this case, the plaintiffs' generalized testimony about "daily" harassment — absent any proof that school officials ever were made aware of additional specific incidents on which they could have taken action — does not aid their case. *See Patterson*, 551 F.3d at 452 (6th Cir. 2009) (Vinson, J., dissenting) ("Obviously, the school district [cannot be held] responsible for failing to stop harassment of which it was not made aware, nor can it be held responsible for failing to punish harassment by unknown individuals.").

Turning to the specific incidents identified by the plaintiff, the record demonstrates indisputably both the temporal attenuation of separate incidents and, nonetheless, a noticeable escalation of the defendants' response.

The first incident occurred on an unspecified date during the 2018-19 school year, and the offender, W.H., was forced to write an apology letter.  No other incidents were reported during that school year.  Three incidents occurred during the 2019-20 school year, in early September 2019, mid-January 2020, and March 5, 2020.  Two of the offending students were disciplined with one-day suspensions, and the third incident was found after an investigation to be "7th grade girl drama," which was not racially related.  The plaintiffs agreed that the school's non-disciplinary response to that incident was "excellent."  No incidents were reported during the 2020-21 school year when the plaintiff was home schooled.

All of the remaining reported incidents occurred over an approximately two-month time frame between early October and early December 2021.

For the first incident, which occurred on October 4, 2021, five students were suspended, most for one day, and one for two days. An October 7, 2021 incident involving a student who apparently was suffering mental issues was investigated by police and determined to be largely an exaggeration of rumors and unrelated to C.M. The student involved apparently was hospitalized to be treated for an acute mental health crisis.

An incident that reportedly occurred on October 14, 2021 could not be further investigated because C.M. was not present during racist conversations and the student who anonymously reported the incident was not identified.

Student A.G., who made racist comments to C.M. and threatened to fight her in late October 2021, was suspended for two days, and upon her return A.G.'s classroom seating assignment was changed to separate her from C.M. C.M. admitted that A.G. did not harass her after that. In a separate incident around Halloween, student W.H., who made an obliquely offensive reference to C.M.'s race, was suspended for one day.

The discipline for successive incidents continued to escalate. For a November 19, 2021 incident in which student S.S. said "I hate all you black bitches," a three-day suspension was imposed. For a December 1, 2021 incident in which a student used the N-word in an out-of-school, after hours online chat, a five-day suspension was imposed.

Racially offensive statements by staff were met with even harsher sanctions. One school monitor who made racist comments about C.M. was terminated. A substitute teacher was treated to a formal reprimand and was not employed for substitute duty thereafter. A teacher who

permitted offense classroom discussion was formally reprimanded and placed on a performance improvement plan for a year.

In the wake of those consequential responses by the defendants, the plaintiffs reported no further specific incidents of racial harassment of C.M. between December 2021 and the withdrawal of her in-person enrollment in February 2022.

That series of events falls noticeably nearer to the circumstances in cases where a school's response has been found to be inactionable, and well short of those where schools have been held liable for inaction.  Notably, the specific events here are both separated in time, involving intermittent incidents years apart and a series of incidents over a period of only approximately two months in late 2021.  Moreover, unlike in those cases where schools did essentially nothing or gave "verbal warnings" only, in this case the responses ramped up rapidly and significantly, proceeding from verbal warnings to one-day, three-day, and five-day suspensions, and eventually involving formal discipline and discharges of culpable staff.  The events in this case fall far short of the circumstances found actionable in *Davis*, *Vance*, and *Patterson*, and well within the bounds of responsive conduct that was found to be reasonable and inactionable in *Foster* and *Stiles*.

The plaintiffs fault the defendants for not resorting to immediate expulsion, which they say was the most severe sanction permitted under the district's racial discrimination and bullying policy.  However, a mere failure by defendant officials to accede to a plaintiff's desire for the most serious available sanction does not establish actionable indifference.  The court of appeals reminds us that "the harasser has 'constitutional [and] statutory' rights too."  *Foster*, 982 F.3d at 969 (quoting *Davis*, 526 U.S. at 649).  The *Foster* court pointed out that "[a]lleged harassers have not been shy about suing school administrations under Title IX and § 1983 for denying them educational opportunities without the requisite notice and process."  *Ibid.* (citing *Doe v. Baum*,

903 F.3d 575, 580 (6th Cir. 2018)).  The court "disagreed" with the idea that a school district was required to avoid a deliberate indifference accusation by "exposing itself to liability from one party or another, coming and going."  *Ibid.*

Even taking the most generous view of the record here, the circumstances provable suggest at most a series of investigations and resulting sanctions that were, even if somewhat anemic, by no means rote or routine.  Moreover, the time span of the harassment judged by the frequency and separation of discrete incidents falls far short of the sort of pervasive harassment where liability has been sustained under Title IX.

The plaintiffs' Title VI claims will be dismissed.

### B.  Equal Protection Claim

Based on the same facts, the plaintiffs allege via 42 U.S.C. § 1983 that C.M.'s constitutional right to equal protection under law was abridged by the defendants' ineffective responses to the complaints of student-on-student racial harassment.  That theory of recovery includes a deliberate indifference element, and for the same reasons discussed above, it cannot succeed on this record.

There are two ways of proving an equal protection violation in this circuit based on a school's response to student-on-student harassment: "(1) disparate treatment of one class of students who complain about bullying as compared to other classes of students, and (2) deliberate indifference to discriminatory peer harassment."  *Stiles*, 819 F.3d at 851-52.  In this case the plaintiff presents her claim through the second method.  "The deliberate indifference standard used for proving a § 1983 equal protection violation in peer harassment cases is 'substantially the same' as the deliberate indifference standard applied in Title IX cases."  *Id.* at 852 (citing *Williams ex rel. Hart v. Paint Valley Loc. Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005)).

As discussed above, the record fails to show that the school administrators acted with deliberate indifference to C.M.'s complaints of harassment.  Dan Gilbertson, Kyle Wood, and other administrators promptly investigated each incident of which they were aware, and each took measures within their power to punish the students found culpable and to prevent further episodes of mistreatment.  A reasonable jury could not find that these actions exhibited deliberate indifference to C.M.'s claims of discriminatory harassment.  The equal protection claim fails for the same reasons discussed above.

### C.  Substantive Due Process

"[T]he substantive component of the Fourteenth Amendment [Due Process Clause]. . . provides that no state can deprive a person of life, liberty, or property without due process." *M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 448 (6th Cir. 2021) (citing U.S. Const. amend. XIV, § 1).  "'But nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors.'" *Ibid.* (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)).  It is settled law that "'a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.'" *Ibid.* (quoting *DeShaney*, 489 U.S. at 197).

An exception to that general rule is found when the state takes action to increase the risk to certain individuals consigned to its care by rendering them more vulnerable to harm.  *Ibid.* (quoting *DeShaney*, 489 U.S. at 198).  To succeed under this so-called state created danger doctrine, a plaintiff "must show three things." *Ibid.*  "First, they must show 'an affirmative act by the state which either created or increased the risk that [they] would be exposed to an act of violence by a third party.'" *Ibid.* (quoting *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)).  "Next, they must establish 'a special danger to [them] wherein the state's actions

placed [them] specifically at risk, as distinguished from a risk that affects the public at large.'" *Ibid.* "And finally, they must show that the state was aware of the 'substantial risk of serious harm' and responded in a way that was 'conscience shocking.'" *Ibid.* (quoting *Doe v. Jackson Local Sch. Bd. of Educ.*, 954 F.3d 925, 934 (6th Cir. 2020)).

The third element of that formula "requires a showing of at least deliberate indifference. And '[t]he government's conduct must be so egregious that it can be said to be arbitrary in the constitutional sense.'" *M.J. ex rel. S.J.*, 1 F.4th at 449-50 (quoting *McQueen v. Beecher Cnty. Schs.*, 433 F.3d 460, 469 (6th Cir. 2006)). Again, because deliberate indifference — a necessary component of the plaintiffs' substantive due process claim — cannot be shown on this record, the claim must fail.

The substantive due process claim also fares no better than the Title VI claim for a different reason, primarily because the court of appeals consistently has rejected attempts to impose liability under that theory based merely on inaction or an allegedly insufficient response by school officials. *Stiles*, 819 F.3d at 854 ("None of the acts identified by Plaintiffs qualifies as an affirmative act that created or increased DS's risk of danger. Failing to punish or insufficiently punishing assailants is generally not an affirmative act, and, even where it is, it typically does not create or increase the plaintiff's risk of harm.") (collecting cases); *id.* at 855 ("Most of the actions Plaintiffs identify are not affirmative acts. Failing to punish students, failing to enforce the law, failing to enforce school policy, and failing to refer assaults to McGinnis are plainly omissions rather than affirmative acts. As for the remaining actions Plaintiffs cite — blaming DS and Stiles, and misleading Plaintiffs to believe Defendants would help DS — Plaintiffs offer no explanation or evidence of how these actions increased DS's exposure to peer harassment. At most, these acts returned DS to a preexisting situation of danger. Nothing suggests DS 'was safer before' Defendants' accusatory

statements and promises to help him than he was afterwards."). Moreover, the Sixth Circuit has rejected the notion that any "special relationship" exists between school officials and students that could trigger an enhanced standard of care. *Id.* at 854 ("[T]he Sixth Circuit has consistently rejected the existence of a special relationship between school officials and students based on compulsory attendance laws or the school's knowledge of a student's vulnerability.").

### D. *Monell* Liability

It is well established that local governmental entities cannot be held liable under 42 U.S.C. § 1983 solely for the acts of their agents; they are accountable under that statute only for their own conduct. *Monell* v. *v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (holding that "a municipality cannot be held liable [under section 1983] solely because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory"). The plaintiffs, therefore, must point to an official policy, custom, or practice of that local government as the source of the constitutional violation. *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005).

But "a municipality can be liable under § 1983 only if there is some underlying constitutional violation for which it could be held responsible." *Stiles*, 819 F.3d at 856. The *Monell* claim against the district fails because, for the reasons discussed above, the plaintiffs have not made out any actionable claim of misconduct by any of the responsible school officials.

### E. ELCRA Claim

The Michigan Elliott-Larsen Civil Rights Act "provides a remedy for plaintiffs who assert hostile educational environment claims on the basis of student-on-student harassment." *Doe by next friend Kolokithas v. Alpena Pub. Sch. Dist.*, No. 359190, 2022 WL 17868146, at *6 (Mich. Ct. App. Dec. 22, 2022). But "[a] school avoids vicarious liability for these claims if it investigates and takes prompt and appropriate remedial action upon learning of the student's behavior." *Ibid.*

The Michigan Court of Appeals "has recognized the lack of education-based ELCRA claims, concluding it is appropriate to turn to employment-based ELCRA cases for guidance." *Id.* at *5. The Michigan appellate courts also frequently draw rules of law from federal case construing analogous federal anti-discrimination statutes. *See Fonseca v. Michigan State Univ.*, 214 Mich. App. 28, 30-31, 542 N.W.2d 273, 275 (1995).

The plaintiffs have not cited any cases evidencing any looser standard of liability that applies to ELCRA claims than those advanced under Title VI. The plaintiffs have offered sufficient evidence of racial harassment that significantly interfered with C.M.'s access to an education in the Croswell-Lexington district schools. But the response by school officials to every reported incident was both "prompt" and "appropriate" according to the delineations of those terms suggested by the applicable Title IX case law discussed above.

The state law claim must be dismissed as well.

### III.

The racial hostility directed at C.M. by more than a few students evidenced in this record is unsettling. No student at any level should be required to endure that abuse from their peers. The Croswell-Lexington School District administrators have a problem on their hands, but they are not deliberately indifferent to it. These students in their formative years were not born with racial hatred and antagonism, but it appears that those lessons were learned at home, not at school. And it is not the district's job "to do the impossible — to 'purge its school [and the community] of actionable . . . harassment." *Foster*, 982 F.3d at 965 (quoting *Davis*, 526 U.S. at 648). The defendants' responses to the plaintiffs' complaints of harassment fell within the bounds of the law. The plaintiffs, therefore, have failed to present evidence that could sustain any of the causes of action pleaded in their complaint within the contours of the prevailing and controlling case law.

- 32 -

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment (ECF No. 27) is **GRANTED**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   February 20, 2024