## UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| Kelly L. Stephens<br>Clerk | 100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988 | Tel. (513) 564-7000<br>www.ca6.uscourts.gov |

Filed: August 25, 2025

Ms. Alexandra Zoe Brodsky
Public Justice
1620 L. Street, N.W.
Suite 630
Washington, DC 20036

Mr. Kenneth Bennett Chapie
Ms. Lindsay P. Hazen
Mr. Timothy John Mullins
Ms. Annabel Frances Shea
Giarmarco, Mullins & Horton
101 W. Big Beaver Road
Tenth Floor, Columbia Center
Troy, MI 48084

Mr. Travis Comstock
Giarmarco, Mullins & Horton
101 W. Big Beaver Road
Tenth Floor, Columbia Center
Troy, MI 48084

Ms. Deborah L. Gordon
Ms. Elizabeth Marzotto Taylor
Ms. Sarah Gordon Thomas
Law Offices
33 Bloomfield Hills Parkway
Suite 220
Bloomfield Hills, MI 48304

Ms. Bonsitu Asia Kitaba
ACLU Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201

Re: Case No. 24-1147, *April Malick, et al v. Croswell-Lexington District, et al*
Originating Case No. : 2:22-cv-11126

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

          Yours very truly,

          Kelly L. Stephens, Clerk


          Cathryn Lovely
          Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0238p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

APRIL MALICK and ROB MALICK, individually and as
Next Friends of C. M., a minor; C. M., a minor by
Next Friends Rob and April Malick,
  *Plaintiffs-Appellants*,

v.

CROSWELL-LEXINGTON DISTRICT SCHOOLS, et al.,
  *Defendants-Appellees*.

No. 24-1147

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:22-cv-11126—David M. Lawson, District Judge.

Argued: March 20, 2025

Decided and Filed: August 25, 2025

Before: McKEAGUE, KETHLEDGE, and READLER, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Sarah Gordon Thomas, DEBORAH GORDON LAW, Bloomfield Hills, Michigan, for Appellants. Kenneth B. Chapie, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellees. **ON BRIEF:** Sarah Gordon Thomas, Deborah L. Gordon, Elizabeth Marzotto Taylor, DEBORAH GORDON LAW, Bloomfield Hills, Michigan, for Appellants. Kenneth B. Chapie, Timothy J. Mullins, Travis Comstock, Annabel F. Shea, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellees. Alexandra Z. Brodsky, PUBLIC JUSTICE, Washington, D.C., Bonsitu Kitaba-Gaviglio, Daniel S. Korobkin, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, for Amici Curiae.

Case 2:22-cv-11126-DML-CI ECF No. 75, PageID.4310 Filed 08/25/25 Page 4 of 16 (4 of 16)

No. 24-1147          *Malick et al. v. Croswell-Lexington Dist. Schs. et al.*          Page 2

---

## OPINION

---

READLER, Circuit Judge.  Regrettably, student C.M. suffered racial harassment by her peers while she attended public school in Michigan.  She claims that her school failed to adequately respond to her complaints, in violation of federal and state law.  The district court disagreed, and so do we.  We affirm.

I.

C.M. suffered student-on-student racial harassment while she attended the sixth, seventh, and ninth grades in the Croswell-Lexington Community Schools District.  (She was homeschooled for eighth grade.)  She was mocked, called the n-word and other racial slurs, threatened, and physically assaulted.  Things got so bad by the middle of her freshmen year that C.M. transferred to another school district.

A few months later, C.M. sued the Croswell-Lexington Community Schools District, the Board of Education, high school Principal Kyle Wood, and Superintendent Dan Gilbertson. (Unless otherwise noted, we will refer to all defendants together as the "school.")  She alleged that the school failed to adequately respond to her complaints of student-on-student racial harassment in violation of both federal law (Title VI of the Civil Rights Act of 1964 as well as the Equal Protection Clause) and state law (the Elliott-Larsen Civil Rights Act).  In a thorough opinion, the district court granted summary judgment to the defendants.  *Malick v. Croswell-Lexington Dist. Schs.*, 717 F. Supp. 3d 639, 644 (E.D. Mich. 2024).  C.M. appealed.

II.

At this stage, the familiar summary judgment principles frame our inquiry.  If, after giving C.M. the benefit of reasonable inferences from the record, there is "no genuine dispute as to any material fact," we ask whether defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.  At the heart of this appeal is C.M.'s claim against her school under Title VI.  "No person in the United States," Title VI commands, "shall, on the ground of race . . . be subjected to discrimination under any program . . . receiving Federal financial assistance."  42 U.S.C. § 2000d.  (The latter phrase encompasses C.M.'s school, as it receives federal funds.)  In bringing suit under Title VI, C.M. asserts what is called a "student-on-student harassment" claim.  *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999).  The gist is that her school "subjected" her to racial "discrimination" by failing to adequately respond to her complaints of racial harassment by other students.  *See* 42 U.S.C. § 2000d.

By way of background, C.M.'s student-on-student harassment claim under Title VI traces its origins to Supreme Court precedent interpreting Title IX of the Education Amendments of 1972.  Title IX contains a prohibition on "discrimination" "on the basis of sex" that mirrors Title VI's race-based one.  20 U.S.C. § 1681(a).  In *Davis*, the Supreme Court held that a school may be liable under Title IX for student-on-student sexual harassment if it responds to "known acts" of sexual harassment by other students with "deliberate indifference."  *Davis*, 526 U.S. at 633.

Does Title VI similarly authorize *Davis*-type claims based on *racial* as opposed to *sexual* harassment?  While no Supreme Court precedent answers the question, every Circuit to consider it agrees that it does.  *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 n.10 (2d Cir. 2012); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 273 (3d Cir. 2014); *Ricketts v. Wake Cnty. Pub. Sch. Sys., WCPSS*, 125 F.4th 507, 521 (4th Cir. 2025); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015); *Doe v. Galster*, 768 F.3d 611, 619 (7th Cir. 2014); *Bryant v. Indep. Sch. Dist. No. I-38*, 334 F.3d 928, 934 (10th Cir. 2003); *Adams v. Demopolis City Schs.*, 80 F.4th 1259, 1273 (11th Cir. 2023); *see also Wani v. George Fox Univ*., 856 F. App'x 672, 676 (9th Cir. 2021) (explaining that Title VI encompasses *Davis* claims based on pre-*Davis* caselaw within the Ninth Circuit).  So far, our Court has yet to address the question.  And we need not do so today, as it ultimately makes no difference to the outcome.  We thus "assume without deciding that deliberate indifference claims are cognizable for racial discrimination under Title VI."  *Thompson v. Ohio State Univ.*, 639 F. App'x 333, 342 (6th Cir. 2016).

No. 24-1147           *Malick et al. v. Croswell-Lexington Dist. Schs. et al.*           Page 4

**B.** With that assumption in mind, turn to the question here: has C.M. established a student-on-student racial harassment claim under Title VI? In line with *Davis*, she must show two things: that she suffered "actionable" harassment and that her school responded to her complaints with "deliberate indifference." *Davis*, 526 U.S. at 633, 650. The school generally accepts that C.M. suffered actionable harassment by a number of different and seemingly unrelated actors, so we focus on whether the school's response reflected "deliberate indifference." *Id.* at 633.

Showing deliberate indifference is no easy task. A plaintiff must establish that her school responded "to known acts of . . . harassment" in a "clearly unreasonable" manner. *Id.* at 648. Through it all, we "ask not whether the school's efforts were ineffective but whether they amounted to an official decision not to remedy" the harassment. *Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960, 968 (6th Cir. 2020) (en banc) (citation modified). To avoid liability, a school need only "respond in good faith when allegations of harassment arise." *Id.* at 965. In this case, C.M. alleges multiple instances of inadequate responses by her school. In a case where a school "adequately responded to some incidents and inadequately to others," we would "evaluate everything as a whole" and ask whether the school was deliberately indifferent "under the totality of the circumstances." *Sneed v. Aus. Indep. Sch. Dist.*, 50 F.4th 483, 491 (5th Cir. 2022). But here, the school did not exhibit deliberate indifference with respect to any of C.M.'s alleged incidents of harassment. In other words, "[w]hether examined incident by incident or in combination," our conclusion remains the same: The school's conduct was not clearly unreasonable. *Foster*, 982 F.3d at 967.

*Sixth grade (2018–2019).* C.M. presented the school with one act of harassment that occurred while she was in sixth grade. Its response was not evidence of deliberate indifference. Late in the summer of 2018, a student called C.M. a "penguin" in class because C.M. was black and had white parents; the student also used the n-word in conversations with her. R. 29-6, PageID 326. C.M.'s father, Rob Malick, reported the misconduct to C.M.'s teacher at a parent-teacher conference, but he then told the teacher that he, his wife, and the other student's mother were "going to try to fix" the problem. R. 29-7, PageID 362. It appears the student then wrote C.M. a letter of apology.

Case 2:22-cv-11126-DML-CI ECF No. 75, PageID.4318 Filed 08/25/25 Page 7 of 16 (7 of 16)

No. 24-1147        *Malick et al. v. Croswell-Lexington Dist. Schs. et al.*        Page 5

*Seventh grade (2019–2020).* For her seventh-grade year, C.M. presented the school with four allegations of harassment. No deliberate indifference occurred.

1. In August 2019, a female student posted the word "nigga" on her Snapchat story. When C.M. saw the post, she said "some very degrading things" in reply, also over Snapchat. R. 29-6, PageID 326. The conflict escalated from there, with the two eventually fighting at school. After the school and its police resource officer investigated the incident, the school suspended the student for one day, notified her guardian about the misconduct, instructed her to write C.M. an apology letter, directed her to meet with school officials, and made her sign a behavior contract regarding social media use. On top of that, the school placed her on "high alert," meaning she could not go near C.M. at school, and assigned a vice principal to patrol the halls between class periods to enforce the prohibition.

2. In January 2020, C.M. heard a rumor that another student was planning to rip C.M.'s hair and record the assault. Rob emailed the school's assistant principal, informing him about the possible threat, at which point the assistant principal began "digging" into the allegation. R. 29-9, PageID 420. The rumored threat was never acted upon, and the assistant principal warned the other student that any "further discussion" about hair-pulling would "lead to consequences." *Id.*

3. In March 2020, C.M. and her classmates watched a video in class. Two actors in the video were black. A classmate turned to C.M. and said, "look, it's your parents." R. 30-1, PageID 468. After C.M.'s teacher learned what was said, she pulled the student into the hallway, "reprimanded him for the comment[,] and explained how insensitive it was." *Id.* She then asked the student—who at that point was "flushed with his mistake" and "had tears in his eyes"—to apologize to C.M. *Id.* He did so, and C.M. accepted his apology. After investigating, the school notified the student's parents about his misconduct, had him sign a behavior contract, and suspended him for one day.

4. At a meeting later that month, C.M. and her parents told the school that a student "was going to dare [a] girl to pull [C.M.'s] hair out" and that students were using the n-word in the school's hallways. R. 49-26, PageID 3069. The school promised to follow up on the first

Case 2:22-cv-11126-DML-CI ECF No. 75-2, PageID.4308 Filed 08/25/25 Page 8 of 16 (8 of 16)

No. 24-1147          *Malick et al. v. Croswell-Lexington Dist. Schs. et al.*          Page 6

complaint, and no evidence shows that C.M. ever suffered harassment tied to the alleged dare. As to C.M.'s complaints regarding use of the n-word, school officials testified they could not verify the allegation. After all, C.M. "could not identify any students specifically using the n-word," and she "stated that no teachers would have heard it." *Id.* at PageID 3070. As C.M. sees it, that is beside the point. Because "the school did not implement measures to monitor and/or put an end to the use of the n-word," she suggests, a jury could reasonably find deliberate indifference here. Appellants' Br. 23. We disagree. To begin, we are skeptical that the school had "actual knowledge" of harassing conduct. *Davis*, 526 U.S. at 642. Who said the n-word? And was it directed against C.M.? Without more information, it is questionable whether C.M. reported an act of harassment here. More fundamentally, COVID-19 forced Michigan to close schools just a few days after C.M. made this allegation. We cannot fault the school for failing to do something it never had the chance to do.

*Ninth grade (2021–2022).* In the fall of 2021, mostly in October, C.M. presented the school with numerous complaints of harassment. The school's responses may not have been perfect, but neither were they clearly unreasonable.

1. On October 4, 2021, Rob emailed the school that "a series of huge incidents" had happened during or around the time of C.M.'s math class. R. 31-1, PageID 746. One student, for example, told C.M. "to go back to the plantation and . . . pick some cotton." R. 50-4, PageID 3097. Multiple other students used racial slurs or made comments or threats relating to C.M.'s hair. The school promptly investigated, interviewing C.M. and the alleged harassers and obtaining confessions. For example, the student who told C.M. to "pick cotton" admitted that he had made a "really messed up" "racist" comment, adding that he was "truly sorry" and hoped C.M. would "forgive[]" him. R. 31-2, PageID 774. The school suspended the student for two days and four other students for one day. One other student was given a warning, and another was not disciplined, at Rob's request, because he "went out of his way to apologize and said he . . . will never do it again." R. 50-4, PageID 3097. Most of these students, it bears mentioning, had no record of disciplinary history—a fact the school considered in issuing its suspensions. Nonetheless, the school issued the discipline noted and required some of the students to do community service.

Case 2:22-cv-14126-DML-CI ECF No. 75, PageID.4305 Filed 08/25/25 Page 9 of 16 (9 of 16)

No. 24-1147         *Malick et al. v. Croswell-Lexington Dist. Schs. et al.*         Page 7

    2. On October 5, 2021, Rob emailed two teachers to tell them that C.M. was enduring racism, both in the halls and in their classes. Rob did not report a specific instance of student-on-student harassment. Nonetheless, both teachers immediately responded to Rob, telling him that C.M. must notify them of any harassment, so they could take appropriate action.

    3. On October 6, 2021, Rob alerted a schoolteacher that a student "[a]pparently" asked C.M. "if her hair was fake." R. 50-5, PageID 3103. This worried Rob because, even though the student did not "say any slurs," C.M. had become "hypersensitive" about hair-related comments. *Id.* The teacher replied that she would look into the matter. The school's decision not to discipline this student was reasonable. He had no record of disciplinary history, had not harassed C.M. before, and did not use any racial slurs. Further, the record suggests, he did not pose his question to C.M. with malice.

    4. On October 11, 2021, C.M. and her parents met with school officials. They largely revisited what had happened the previous week during or around C.M.'s math class. C.M. faults the school for not subsequently issuing "directives" to her math teacher "on how to improve" her class environment. Appellants' Br. 30. But it does not appear that any new accusations of racial bullying were made at this meeting, and the school had already responded to the previously reported incidents.

    5. On October 26, 2021, Rob told the school that four students had made comments about C.M.'s hair during class 12 days earlier. He premised this allegation on a handwritten note authored by an unnamed student. The school investigated the incident but could not verify whether any comments had been made. Further, the school learned, C.M. was not even in class at the time of the alleged comments.

    6. On October 27, 2021, Rob emailed Superintendent Gilbertson to inform him that a student was "making snarky comments" in front of C.M. during class, such as "oh that's racist." R. 31-7, PageID 807. Gilbertson responded by commanding Wood to "conduct an investigation under" the school's "anti-discrimination policy." *Id.*

    7. On October 27, 2021, Rob reported that C.M. had heard about one student telling another "these [n-words] are gonna get it." R. 51-1, PageID 3296. The school interviewed

Case 2:22-cv-11264-DML-CI ECF No. 75, PageID.4316 Filed 08/25/2025 Page 10 of 16 (10 of 16)

No. 24-1147            *Malick et al. v. Croswell-Lexington Dist. Schs. et al.*            Page 8

several witnesses and later suspended the student for three days. It also took proactive measures to protect C.M. from further harassment by that student.

8. On October 29, 2021, C.M. went to school dressed as a blue M&M for Halloween. In the hallway, a student told C.M. that M&Ms were white, not blue. When the school investigated, the student explained that he was making a joke about Eminem, a white rapper, but the school still suspended him for one day. C.M.'s parents later reported that this student accused C.M. of being unable to take a joke, called her a "narc" over Snapchat, and, along with a friend, threatened to "get [her] back." R. 50-11, PageID 3132; R. 50-13, PageID 3138. The school interviewed the students involved, and no record evidence shows that they gave C.M. a problem again.

9. On November 8, 2021, Rob heard that a school employee had made racist comments about C.M. to another employee. Allegedly, the employee said that C.M. was "playing the race card"; that she was "no saint"; and that she acted like she was "from the hood in Detroit." R. 35, PageID 912. After interviewing the employee, her accuser, and another witness, the school fired the employee for "derogatory comments made about a student." *Id.* at PageID 914. It is difficult to see how this incident qualifies as "harassment" for purposes of a student-on-student racial harassment claim: The employee was not a student, and she never said anything to or in front of C.M. But even so, the school responded reasonably by firing her.

10. On November 17, 2021, several students were talking about politics in a Snapchat group chat, and one of them said, "Obama was a stupid [n-word]." R. 31-6, PageID 797. Someone showed the message to C.M., and the school suspended the culprit for five days.

11. On November 19, 2021, a student approached C.M. and her friends in school and said, "I hate all you black bitches." R. 29-6, PageID 337. The school investigated the incident and suspended the student for five days.

12. On December 7, 2021, a student posted a picture of himself wearing a do-rag on his Snapchat story, with the caption "Got the silky onnnn." R. 36-2, PageID 987–89. Someone showed the picture to C.M., who thought the post "was mocking African American Culture." *Id.* at PageID 991. The school suspended the student who made the post for two days.

Case 2:22-cv-11126-DML-CI ECF No. 75, PageID.4317 Filed 03/25/25 Page 11 of 16 (11 of 16)

No. 24-1147        *Malick et al. v. Croswell-Lexington Dist. Schs. et al.*        Page 9

13. Lastly, in December 2021, Rob complained that a teacher had permitted "[r]acist" conduct and "racial behavior" to flourish in his classroom. R. 29-7, PageID 388. Given that C.M. never had this teacher, and that she never heard him say anything offensive, it is difficult to see how this qualifies as an act of student-on-student harassment. Nonetheless, the school investigated, issued a formal reprimand, and placed the teacher on a one-year probationary period.

\*   \*   \*

As these examples reflect, the school's response to C.M.'s situation was not clearly unreasonable. Its actions bear all the hallmarks of good faith. It took "affirmative steps" to "address the incidents of harassment" such as "meeting with the students, communicating with parents, and disciplining the offending students." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 455 (6th Cir. 2008). It "investigated promptly and thoroughly" "each time" C.M. "communicated a specific complaint of harassment." *Stiles ex rel. D.S. v. Grainger County*, 819 F.3d 834, 849 (6th Cir. 2016). Then, it "disciplined students found guilty of wrongdoing either with a verbal warning or a suspension." *Id.* Its "decision to punish and the level of punishment differed based on school officials' conversations with alleged offenders and eyewitnesses, the offending student's record of similar behavior, and school officials' evaluation of the severity of the conduct—all reasonable considerations." *Id.* In other words, it "meted out punishment commensurate with its findings." *Gordon v. Traverse City Area Pub. Schs.*, 686 F. App'x 315, 324 (6th Cir. 2017). Plus, it took "proactive measures" to protect C.M. from further harassment. *Foster*, 982 F.3d at 967.

By the same token, nothing in the school's response amounted to deliberate indifference. It did not fail to "respond in any way" to C.M.'s complaints. *Davis*, 526 U.S. at 649. It neither told C.M. that the "matter was out of" its "hands," *Doe ex rel. Doe # 2 v. Metro. Gov't of Nash. & Davidson Cnty.*, 35 F.4th 459, 467 (6th Cir. 2022) (citation modified), nor refused to "conduct any substantive investigation[s]" into her complaints, *Mathis v. Wayne Cnty. Bd. of Educ.*, 496 F. App'x 513, 516 (6th Cir. 2012). Nor did the school delay in taking "concrete action," *Doe v. E. Haven Bd. of Educ.*, 200 F. App'x 46, 49 (2d Cir. 2006), including corrective action against C.M.'s harassers, *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 257 (6th Cir. 2000).

Case 2:22-cv-11126-DML-CI ECF No. 75, PageID.4318 Filed 08/25/25 Page 12 of 16 (12 of 16)

No. 24-1147          *Malick et al. v. Croswell-Lexington Dist. Schs. et al.*          Page 10

Because no deliberate indifference occurred, C.M.'s Title VI claim fails. And that means her separate claim under 42 U.S.C. § 1983 for violation of the Equal Protection Clause also fails. *Stiles*, 819 F.3d at 852 (noting that Equal Protection claims mirror Title VI claims in this context). So too does C.M.'s claim under Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws Ann. §§ 37.2402, .2801, which required her to show that the school did not take "prompt and appropriate remedial action" upon learning of her harassment, *Doe ex rel. Kolokithas v. Alpena Pub. Sch. Dist.*, No. 359190, 2025 WL 1112610, at *5 (Mich. Ct. App. Apr. 14, 2025) (per curiam). As detailed above, C.M.'s school did so.

C.1. C.M. offers three arguments in response. She begins by invoking the following sentence in *Vance*: "Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances." 231 F.3d at 261. To her mind, that logic applies here because the school "did not change course upon learning that [its] methods were ineffective in stopping the harassment." Appellants' Br. 46.

This argument has four problems. One is a faulty premise, as the school's responses, properly considered, were effective. Whether a school was ineffective in stopping harassment must be judged by reference to its response to specific known harassers, not its failure to perform the "impossible" task of anticipating new harassers. *See Foster*, 982 F.3d at 965. Here, the record reflects very little repeat harassment by students after they were disciplined for similar misconduct. For example, C.M. asserts that one student, A.G., "was one of the worst offenders of racial bullying of C.M." Appellants' Br. 24. But A.G. harassed C.M. only once in high school, which earned her an escalated disciplinary measure in the form of a three-day suspension. After that, C.M. acknowledges, A.G. never harassed her again. If A.G. was one of C.M.'s worst harassers, the school seemingly was effective at stopping individual students from repeatedly harassing C.M.

Two, *Vance* does not support the sweeping rule C.M. attributes to it—namely, that a jury could find deliberate indifference any time a school's response to harassment is ineffective. In *Vance*, the school responded to repeated student-on-student harassment in one way only—by talking to the harassers. *Vance*, 231 F.3d at 256–57, 262. There was "no evidence" that the

Case 2:22-cv-11126-DML-CI ECF No. 75, PageID.4309 Filed 08/25/25 Page 13 of 16 (13 of 16)

No. 24-1147          *Malick et al. v. Croswell-Lexington Dist. Schs. et al.*          Page 11

school "ever disciplined the offending students" or "took any other action whatsoever." *Id.* In light of these facts, *Vance* stands for the minor proposition that schools cannot merely "rely[] on verbal warnings that repeatedly do not work." *Foster*, 982 F.3d at 968. That did not happen here, making *Vance* a poor guide for resolving C.M.'s case. *See Stiles*, 819 F.3d at 850 (finding *Vance* inapplicable because "the school's efforts . . . went beyond merely talking to the offenders"); *R.L. ex rel. R.S. v. Knox County*, No. 24-5002, 2024 WL 4695966, at *7 (6th Cir. Nov. 6, 2024) (similar).

Three, intervening precedents make clear that we do not send a case to a jury simply because a school's response fails to stop harassment. *Davis*, for one, held that schools need not "purg[e]" themselves "of actionable peer harassment." *Davis*, 526 U.S. at 648. And in *Foster*, our en banc Court rejected the plaintiff's assertion that, as C.M. argues here, "whenever harassment continues after a school receives notice, a reasonable jury can find that the school remained deliberately indifferent." *Foster*, 982 F.3d at 968. That notion, we explained, "calls to mind strict liability, not deliberate indifference." *Id.* *Foster* went a step further to clear up any possible confusion created by *Vance*. To the extent *Vance* (and some cases that came after it) "suggest[ed] that an ineffective response necessarily generates a jury issue on deliberate indifference," we said, "that is wrong." *Id.* The deliberate-indifference question, *Foster* emphasized, is "not whether the school's efforts were ineffective but whether they amounted to an official decision not to remedy the [harassment]." *Id.* (citation modified). Assessed against that standard, C.M.'s school responded in good faith, for the reasons explained above.

Last, C.M. offers three approaches she says the school could have taken but did not. At the outset, it bears noting that *Foster* instructed courts not to base the deliberate-indifference test simply on whether other decisions could have been made—otherwise "strict liability would be the rule." *Foster*, 982 F.3d at 968. Nonetheless, as in *Foster*, so too here: "[I]t's still worth asking the question because, if the claimant can't identify a better approach, it follows that no deliberate indifference occurred." *Id.*

C.M first contends that the school could have issued harsher suspensions. But courts may not "second-guess[] the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648. And this makes sense: "Disciplinarians, although proceeding in utmost good faith,

Case 2:22-cv-11126-DML-CI ECF No. 29-3, PageID.4320 Filed 08/25/25 Page 14 of 16 (14 of 16)

No. 24-1147    *Malick et al. v. Croswell-Lexington Dist. Schs. et al.*    Page 12

frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed." *Goss v. Lopez*, 419 U.S. 565, 580 (1975). On top of that, the Michigan Attorney General cautions schools against issuing suspensions because "[e]xclusionary discipline can have life-long adverse impacts on students." R. 29-3, PageID 272. With these background principles in mind, what basis do we have to say the school could have issued harsher suspensions? Schools can—indeed, should—respond incrementally to allegations of harassment. That is what happened here.

C.M. next faults the school for not creating a rule prohibiting students from wearing the Confederate flag symbol in school. But it is unclear how that would have helped C.M.'s situation given that she points us to only one such incident and that the school immediately made that student remove the flag.

C.M. also believes the school could have educated its students about racial harassment through trainings and assemblies. Perhaps. But schools can also educate their students about racial harassment through individualized discipline and communication with parents, social workers, and police resource officers, the course chosen here.

2. C.M. next argues that the school's "widespread problem of racial harassment was a *known circumstance* that the district court ignored." Appellants' Br. 50 (emphasis added) (citation modified). This argument seemingly draws on *Davis*, which, recall, requires a claimant to show that the school's response to harassment was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Applied here, C.M. sees the school's response to her complaints as unreasonable in light of the "known circumstance" of widespread racial harassment on campus. *Id.* But tacking on this additional known circumstance does not change the fact that the deliberate indifference inquiry must focus on the particular incidents of harassment suffered by C.M. and the school's response to those particular incidents. As shown above, the school's response to each incident was sufficient, even if it knew about a broader issue with racism.

3. Switching gears, C.M. next argues that the district court ignored two record-supported facts that (in her view) prove deliberate indifference. She begins by explaining that the school

No. 24-1147         *Malick et al. v. Croswell-Lexington Dist. Schs. et al.*         Page 13

knew a handful of unnamed students had made jokes about its disciplinary efforts and "bragg[ed] about not getting suspended for engaging in racial harassment." R. 49-15, PageID 2996. This shows that the school was deliberately indifferent, she argues, because it knew that its disciplinary "practices were not being taken seriously"—a reality that should have prompted it to "increase disciplinary consequences" or "implement non-disciplinary educational opportunities." Appellants' Br. 56. This argument fails because, once again, we care only about the school's response to "known acts of harassment." *Davis*, 526 U.S. at 633. The school's knowledge that some students had laughed at (or bragged about) its purportedly light disciplinary measures is relevant only if that fact demonstrates a clearly unreasonable response to one or more incidents of harassment. Here, C.M. offers no record evidence that the school ever learned *which* students were not taking disciplinary measures seriously and thus *which* students to watch more closely or discipline more harshly the next time they offended.

C.M. also says that the school never changed its approach to handling racial harassment when she returned to in-person learning in ninth grade, rendering it deliberately indifferent to her prior complaints throughout middle school. It is true that the unfortunate trend of racist bullying followed C.M. from middle school to high school. But to say the school took no steps to prevent it from occurring is an overstatement. Superintendent Gilbertson emailed C.M.'s parents the summer before she started high school offering to discuss any concerns they had. Likewise, Principal Wood and a high school guidance counselor met with C.M.'s parents before she began ninth grade to discuss the issues she faced in middle school. The counselor modified C.M.'s schedule to separate her from a student who had given her problems previously. And, as explained above, the school proceeded to address concerns C.M. raised on a case-by-case basis in accord with reasoned decision-making. No deliberate indifference occurred.

*        *        *        *        *

We affirm.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 24-1147

APRIL MALICK and ROB MALICK, individually and as Next Friends of C. M., a minor; C. M., a minor by Next Friends Rob and April Malick,

    Plaintiffs - Appellants,

v.

CROSWELL-LEXINGTON DISTRICT SCHOOLS, et al.,

    Defendants - Appellees.

FILED
Aug 25, 2025
KELLY L. STEPHENS, Clerk

Before: McKEAGUE, KETHLEDGE, and READLER, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

ENTERED BY ORDER OF THE COURT

*Kelly L. Stephens*

Kelly L. Stephens, Clerk